RICHARD S. ARNOLD, Chief Judge.
 

 The question presented is the validity under the Commerce Clause of two Acts of the Arkansas General Assembly regulating the disposal of solid waste, Act 870 of 1989
 
 *373
 
 and Act 319 of 1991. Southeast Arkansas Landfill, Inc., a debtor in bankruptcy, brought this case as an adversary proceeding against the Arkansas Department of Pollution Control and Ecology (PC & E), the State agency charged with the administration of these statutes. The District Court referred the matter to a bankruptcy judge for recommended findings and conclusions, see 28 U.S.C. § 157(b), (c). The Bankruptcy Judge recommended that the Acts be upheld, and that the debtor’s suit for an injunction against their enforcement be dismissed. The District Court accepted this recommendation and entered judgment accordingly, 137 B.R. 735. This appeal followed.
 

 We hold that portions of the Acts in question discriminate on their face against solid waste originating outside the State of Arkansas. State statutes having this effect violate the Commerce Clause unless the State proves that out-of-state waste is for some reason more harmful than in-state waste.
 
 City of Philadelphia v. New Jersey,
 
 437 U.S. 617, 629, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978). The State has not come forward with any such proof, and, indeed, does not suggest that it could do so. Accordingly, we hold that the statutes in question, to the extent indicated in this opinion, are unconstitutional, and we reverse the judgment of the District Court.
 

 I.
 

 Act 870 of 1989 was approved on March 22 of that year. It establishes a planning and management process for solid waste. The hallmark of this process is that it is to proceed on a regional basis. The statute divides the State into eight regions, referred to as Regional Solid Waste Planning Districts, each to be managed, within certain limits, by a Regional Solid Waste Planning Board. The principal portion of the Act which gives rise to the present controversy is Section 6. This Section reads as follows:
 

 SECTION 6. Until January 31, 1991, no existing landfill shall expand its service area outside of the District in which it is located. Existing landfills that currently serve areas outside of their respective Districts shall not increase the total amount of solid waste originating from outside their Districts by more than twenty percent (20%) of the total solid waste received at such facility. No new landfill shall be allowed to receive solid waste outside the boundaries of the District in which it is located until after January 31, 1991. No new applications for landfill permits seeking to dispose of solid waste originating outside of the district created hereunder, or that propose to dispose of solid waste originating from outside such district, shall be accepted or processed by the Commission or a regional solid waste planning board, unless such applications were pending before the Department of Pollution Control and Ecology as of March 1, 1989. All landfill permit applications shall specify the service areas which the landfill will serve under the permit.
 

 Thus, under Act 870 as originally passed, landfills are, as a general rule, forbidden to accept waste from outside the boundaries of the Regional Solid Waste Planning District in which they are located. There are some exceptions to this ban. Landfills already serving areas outside of their districts may continue to do so, but the total amount of waste originating from outside the district may not increase by more than 20% of the total solid waste received at the landfill. No new applications for landfill permits seeking to dispose of out-of-district waste are to be processed, unless they were already pending before PC & E on March 1, 1989. However, under the original Section 6, after January 31, 1991, existing landfills could expand their service area outside of the districts in which they are located, and new landfills could begin to receive out-of-district waste.
 

 As the January 31, 1991, date in Section 6 of Act 870 demonstrates, the statute was, in part, a moratorium, not an absolute prohibition. The next regular session of the General Assembly convened in January of 1991. As the end of the month drew near, it became apparent that a comprehensive new statute, amending Act 870, would not
 
 *374
 
 be ready by the January 31 deadline. Accordingly, on January 31, 1991, a new statute, Act 9 of 1991, became law. The new statute repeated all of the substantive provisions of Section 6 of Act 870, but substituted a new deadline: March 2, 1991.
 

 The statutory picture was completed, for present purposes, on March 1,1991 (in time to meet the new deadline of March 2,1991). Act 319 of 1991 continues the policy of restricting the disposal of out-of-district waste, but changes the terms of the restriction somewhat. The heart of the Act, at least for purposes of the present case, is found in Section 4, which provides in pertinent part as follows:
 

 SECTION 4. (a) This section shall apply until the later of: (1) July 1, 1992 or (2)until the capacity of landfills in both the district and the state reaches a ten (10) year capacity.
 

 * * sH >H * *
 

 (c)(1) No existing landfill shall expand its service area outside the district in which it is located; except that existing landfills that on the [sic] March 1, 1989 do not serve areas outside their respective districts shall not accept more than fifty (50) tons per day of solid waste originating from outside their districts.
 

 (2) Existing landfills that on March 1, 1989 serve areas outside of their respective districts shall not increase the total amount of solid waste originating from outside their districts by more than twenty percent (20%) annually of the total volume of solid waste received at the facility from outside their districts. The amount of solid waste shall be determined by volume except that the amount of incinerator ash shall be determined by weight.
 

 (3) No new landfill shall be allowed to receive solid waste outside the boundaries of the district in which it is located, unless it is a landfill where a private industry bears the expense of operating and maintaining the landfill solely for the disposal of wastes generated by the industry or of wastes of a similar kind or character, and such industry has commenced, prior to the effective date of this Act, the process for obtaining a permit by issuing notice to the local government having jurisdiction, as required under the rules and regulations of the Department of Pollution Control and Ecology.
 

 (4) No new applications for landfill permits seeking to dispose of solid waste originating outside of a district or that propose to dispose of solid waste originating from outside such district shall be accepted or processed by the commission or a board, unless such applications were pending before the Department of Pollution Control and Ecology on March 1, 1989. Provided, the prohibition contained in this subsection shall not apply to new applications for landfill permits if the landfill is one where a private industry bears the expense of operating and maintaining the landfill solely for the disposal of wastes generated by the industry or of wastes of a similar kind or character, and such industry has commenced, prior to the effective date of this Act, the process for obtaining a permit by issuing notice to the local government having jurisdiction, as required under the rules and regulations of the Department of Pollution Control and Ecology.
 

 (d) The director of the Department of Pollution Control and Ecology may grant an exemption from this section for solid waste brought into a district for the purpose of recycling. Exemption shall be subject to such terms and conditions as the director may deem appropriate.
 

 (5) A successor district may transport solid waste to any one of the original districts of which the members of the successor district were a part.
 

 The general policy of Act 870, restricting a landfill’s use for out-of-district waste, is still in effect under Act 319. However, existing landfills that accepted out-of-district waste on March 1, 1989, may continue to do so, and may increase the total amount of out-of-district waste up to 20% of the total volume of solid waste received. Existing landfills not accepting.out-of-district waste on March 1, 1989, may decide to do so, but not in excess of 50 tons per day. New landfills may not receive out-of-dis
 
 *375
 
 trict waste at all, except for landfills operated by a private industry solely for the disposal of waste generated by the industry or of waste of a similar kind. This last exception, however, is limited to landfills who had already commenced, before the effective date of Act 319, a process for obtaining a permit.
 

 One other feature of Act 319 should be mentioned. Section 5 of the Act creates an exception in favor of landfills with a useful life of less than one and one-half years. This exception, referred to by the parties as the “Fayetteville Amendment,” after a city in the northwest part of the State, authorizes a city using a landfill with such a short useful life to transport waste outside the boundaries of the district in which the city is located.
 

 II.
 

 The legal framework against which these statutes are to be judged is clear. Parochial legislation designed to further the economic interests of a state’s own citizens at the expense of those in other states is treated with great suspicion. “[W]here simple economic protectionism is effected by state legislation, a virtually
 
 per se
 
 rule of invalidity has been erected.”
 
 City of Philadelphia, supra,
 
 437 U.S. at 624, 98 S.Ct. at 2535. If, however, “other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach....”
 
 Ibid.
 
 The contours of that flexible approach were outlined in
 
 Pike v. Bruce Church, Inc.,
 
 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In general, if a statute regulates evenhandedly to effectuate a legitimate local interest, with only incidental effects on interstate commerce, “it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.”
 
 Id.
 
 at 142, 90 S.Ct. at 847.
 

 The statute at issue in
 
 City of Philadelphia
 
 contained a flat prohibition against the importation into New Jersey of any solid or liquid waste which originated or was collected outside the territorial limits of the state. There were a few narrow exceptions. The Supreme Court had little trouble striking down the statute. It was, the Court explained, a clear example of discrimination against interstate commerce. It placed at a disadvantage out-of-state persons seeking to buy landfill space in New Jersey for the disposal of waste generated outside the state. The ultimate aim of the statute, to save remaining open lands from pollution, was completely legitimate, but that aim could be obtained by slowing the flow of all waste, including in-state waste, into the state’s remaining landfills. There was no basis for a distinction between out-of-state and in-state waste. “If one is inherently harmful, so is the other. Yet New Jersey has banned the former while leaving its landfill sites open to the latter.”
 
 City of Philadelphia,
 
 437 U.S. at 629, 98 S.Ct. at 2538.
 

 So much is common ground between the parties. The State does not challenge the principles of
 
 City of Philadelphia.
 
 It argues, instead, that the statutes at issue here do not discriminate against out-of-state waste: they regulate evenhandedly as between in-state and out-of-state waste. Waste that comes from outside a given district, but from within the state, the argument goes, is subject to exactly the same restrictions as waste coming from out of state. (In fact, this is not quite true, as the “Fayetteville Amendment” referred to above shows. An Arkansas city with an acute shortage of landfill space within the district in which it is located can ship its waste to another district within the state, but an out-of-state city with the same problem cannot do so. In general, however, we shall accept the State’s premise that instate, out-of-district waste is treated identically with out-of-state waste, and proceed with the analysis on that basis.)
 

 When the Bankruptcy Judge and the District Court considered this case, there was authority supporting the view taken by the State. Specifically,
 
 Bill Kettlewell Excavating, Inc. v. Michigan Department of Natural Resources,
 
 931 F.2d 413 (6th Cir.1991), had upheld a Michigan statute prohibiting private landfill operators from ac
 
 *376
 
 cepting solid waste originating outside the county in which their facilities were located. After the District Court entered its judgment in this case, however, the Supreme Court reversed the Sixth Circuit’s judgment in
 
 Bill Kettlewell,
 
 see
 
 Fort Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources,
 
 — U.S. -, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). Under the Supreme Court’s opinion in
 
 Fort Gratiot,
 
 the position taken by PC & E in the present appeal is no longer tenable.
 

 The Michigan statute at issue, Mich. Comp.Laws Ann. §§ 299.401-299.437 (1984 ed. & Supp.1991), required each county to estimate the amount of waste that would be generated within its boundaries and to adopt a plan for disposing of that waste. Landfills within the county could not accept out-of-eounty waste unless the county explicitly chose to authorize such acceptance in its approved solid waste management plan. Mich.Comp.Laws Ann. §§ 299.413a, 299.430(2) (Supp.1991). Under this regime, in-state, out-of-county waste was treated exactly the same as out-of-state waste: landfills could not receive it without the consent of the county.
 

 The Supreme Court began by restating general principles.
 

 A state statute that clearly discriminates against interstate commerce is ... unconstitutional “unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.”
 
 New Energy Co. of Indiana v. Limbach,
 
 486 U.S. 269, 274 [108 S.Ct. 1803, 1808, 100 L.Ed.2d 302] (1988).
 

 Fort Gratiot,
 
 — U.S. at -, 112 S.Ct. at 2023-24. The Court then summarized the argument made by the state — an argument identical in principle to that urged before us by Arkansas: Michigan argued that its statute does
 

 not discriminate against interstate commerce on [its] face or in effect [because it] treat[s] waste from other Michigan counties no differently than waste from other States. Instead, ... the statute regulates evenhandedly to effectuate local interests and should be upheld because the burden on interstate commerce is not clearly excessive in relation to the local benefits. Cf.
 
 Pike v. Bruce Church, Inc.,
 
 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970). We disagree, for our prior cases teach that a State ... may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself.
 

 — U.S. at -, 112 S.Ct. at 2024. Nor does it matter that individual counties may choose to accept out-of-state waste. This limited exception “merely reduce[s] the scope of the discrimination; for all categories of waste not excepted ..., the discriminatory ban remain[s] in place.”
 
 Id.,
 
 — U.S. at -, 112 S.Ct. at 2025.
 

 The Court then discussed the State’s final argument, that restrictions on out-of-county waste are necessary because they enable counties to make adequate plans for the safe disposal of waste in the future. The Court rejected this argument in the following terms, which are fully applicable to the present case:
 

 Michigan could attain that objective without discriminating between in- and out-of-state waste. Michigan could, for example, limit the amount of waste that landfill operators may accept each year. See
 
 Philadelphia v. New Jersey,
 
 437 U.S., at 626 [98 S.Ct. at 2536]. There is, however, no valid health and safety reason for limiting the amount of waste that a landfill operator may accept from outside the State, but not the amount that the operator may accept from inside the State.
 

 — U.S. at -, 112 S.Ct. at 2027.
 

 We see no way that PC & E can avoid the force of this reasoning. Indeed, at the oral argument counsel for the State seemed to acknowledge that
 
 Fort Gratiot
 
 created a problem, but suggested that if we disagreed with the analysis of the District Court in this case, we should remand for further proceedings instead of reversing outright. What the purpose of such proceedings would be, we are not able to discern. Under
 
 Fort Gratiot,
 
 unless there
 
 *377
 
 is some showing that the out-of-state waste excluded is more harmful than the in-state waste allowed, the statute must fail. The State’s principal argument, that exclusion of in-state, out-of-district waste validates exclusion of out-ofrstate waste, is squarely rejected by the
 
 Fort Gratiot
 
 opinion.
 

 The State also suggests that the statute can be saved because it is no more than the effort of the State to comply with federal policy as expressed in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq. (RCRA). This Act, the State says, is not cited in the
 
 Fort Gratiot
 
 opinion, so the argument based on the federal statute is still open. We are constrained to disagree. In the first place, it can hardly be supposed that the
 
 Fort Gratiot
 
 Court was unaware of RCRA. The statute is referred to in the
 
 City of Philadelphia
 
 opinion, 437 U.S. at 620-21 n. 4, 98 S.Ct. at 2534 n. 4, and regulations promulgated by the United States Environmental Protection Agency pursuant to the statute are referred to in the dissenting opinion in
 
 Fort Gratiot,
 
 — U.S. at -, 112 S.Ct. at 2029-31. It is certainly true, as the Supreme Court held in
 
 City of Philadelphia,
 
 437 U.S. at 620-21, 98 S.Ct. at 2533-34, that the Arkansas statutes are not preempted by RCRA or other federal legislation, and cannot be invalidated on that ground. The claim in the present case, though, is not preemption. It is that the statutes in question violate the so-called “dormant” or “negative” Commerce Clause — that is, that the Commerce Clause of its own force invalidates them, entirely apart from any congressional action. RCRA does mandate a system of regional planning by the states, and the statutes involved in this case are responses to that mandate. But nothing in RCRA or any other federal statute comes close to authorizing different treatment of out-of-state waste. We conclude that the State’s argument based on RCRA cannot be accepted.
 

 III.
 

 Fort Gratiot
 
 compels a reversal in this case. Whether this is wise policy is not our business. If Congress believes it is unwise, if Congress wishes to authorize a regime under which each region, so to speak, takes care of its own waste, it can certainly do so. No such authority now exists, and we have no choice but to follow clear Supreme Court precedent. “[0]ur economic unit is the Nation.... [T]he states are not separable economic units.”
 
 H.P. Hood & Sons, Inc. v. Du Mond,
 
 336 U.S. 525, 537-38, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949), cited with approval in
 
 City of Philadelphia,
 
 437 U.S. at 623, 98 S.Ct. at 2535.
 

 The judgment of the District Court, dismissing the debtor’s complaint in this adversary proceeding, is reversed, and this cause is remanded to that Court with directions to fashion equitable relief consistent with the principles laid down in this opinion. It is not our intention to invalidate or interfere with any provisions of Act 870 of 1989 or Act 319 of 1991 that do not discriminate against interstate commerce, and we note that both statutes contain severability clauses. Act 870, Section 13; Act 319, Section 7. In addition, nothing in this opinion in any way diminishes the right of the State to require landfills within its borders to meet health and safety standards.
 

 Reversed and remanded with instructions.