985 F.2d 1381
 36 ERC 1170, 23 Envtl. L. Rep. 20,787
 WASTE SYSTEMS CORP., an Iowa corporation, Appellee,
v.
COUNTY OF MARTIN, MINNESOTA; County of Faribault,
Minnesota, Appellants.
State of Arkansas; State of Delaware; State of Florida;
State of Indiana; State of Iowa; State of Kansas; State
of Maryland; State of Michigan; State of Minnesota; State
of Mississippi; State of Nebraska; State of Nevada; State
of New Jersey; State of North Carolina; State of North
Dakota; State of Ohio; State of Pennsylvania; State of
Virginia; Sierra Club; The Minnesota County Attorneys
Association; The Association of Minnesota Counties;
Western Lake Superior Sanitary District, Amici Curiae.
 No. 92-1642.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 9, 1992.
Decided Feb. 18, 1993.
 
 Walter J. Duffy, Minneapolis, MN, argued (James R. Steffen, on the brief), for appellants.
 Timothy R. Thornton, Minneapolis, MN, argued (Jack Y. Perry, on the brief), for appellee.
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and VAN SICKLE,* Senior District Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Martin and Faribault Counties appeal from an order granting Waste Systems Corporation's motion for summary judgment. Martin and Faribault Counties had enacted waste designation ordinances mandating that all compostable solid waste generated within their borders be delivered to the Prairieland Solid Waste Composting Facility. The district court[1] found the ordinances violated the Commerce Clause, and permanently enjoined their enforcement. We affirm and remand for further proceedings regarding Waste Systems' 42 U.S.C. § 1983 claim.
 
 I. BACKGROUND
 A. The Plant
 
 2
 In 1989, Martin and Faribault Counties (the Counties) created a joint powers board, the Prairieland Solid Waste Board (the Board), for the purpose of constructing and operating a solid waste composting facility. The Board subsequently sold approximately $8,000,000 in bonds guaranteed by the Counties to finance building the Prairieland Solid Waste Composting Facility (the Plant) located in Truman, Minnesota. The Plant opened in July 1991.[2]
 
 
 3
 Before the Plant was constructed, all solid waste was transported out of the Counties for disposal.[3] Approximately two-thirds of the waste generated by the Counties was disposed of across state lines in a clay-lined landfill[4] located in Lake Mills, Iowa, and operated by Waste Systems Corporation, an Iowa corporation.[5]
 
 B. The Designation Plans
 
 4
 While the Plant was still in the planning stages, the Counties prepared and approved designation plans.[6] In the designation plans, the Counties examined the needs of the Plant, and considered whether to adopt ordinances designating that all compostable solid waste generated in the Counties be delivered to the Plant.
 
 
 5
 When discussing the need for designation, both Counties' designation plans state:
 
 
 6
 A critical element in assuring both the reliability and financial security of the Facility is the commitment of a long-term waste supply. Without an adequate supply of waste, the Facility can not be financially successful. The waste supply will serve as a source of revenue for the Facility.... [D]esignation is necessary for financial security of the Facility.
 
 
 7
 Martin County Designation Plan (Martin Plan) at 2; Faribault County Designation Plan (Faribault Plan) at 2 (emphasis added). The theme of the need for designation for economic reasons is repeated:
 
 
 8
 Designation of the Facility is necessary for financial support for both the initial development and the successful operation of the Facility.
 
 
 9
 ....The financial feasibility of the project would be negatively impacted without designation.
 
 
 10
 ....
 
 
 11
 The financial stability of the Facility is directly dependent on the waste received by the Facility.
 
 
 12
 Martin Plan at 23; Faribault Plan at 21.
 
 
 13
 In the designation plans, the Counties also discuss whether methods less restrictive than designation would ensure that waste be delivered to the Plant. They reject the option of seeking contractual commitments. In the section regarding contractual commitments with public entities, the Counties state "residents may self haul to closer or cheaper alternatives outside the County. Those disposal alternatives may include existing facilities or future facilities sited in Iowa or adjacent Counties." Martin Plan at 28; Faribault Plan at 26. Regarding the method of contractual commitments with private haulers, the Counties state "[s]elf haul wastes will not be required to flow to the Facility. Over the project life, self haul volumes may increase and flow to more economical disposal alternatives." Martin Plan at 30; Faribault Plan at 28. Both plans identify disposal alternatives in Iowa as potentially more economical to public entities and private haulers.
 
 
 14
 The Counties also explore and reject the possibility of using economic incentives (subsidizing the fees paid to the Plant for waste disposal). In this discussion, they state a "reason that economic incentives would be unsatisfactory as a method of waste assurance for the Facility is an economic one. Economic incentives would increase the cost of the project." Martin Plan at 33; Faribault Plan at 30-31. Although recognizing that closure of disposal facilities outside the Counties was not a viable alternative because the Counties had no control over such facilities, the plans also discuss this alternative. The Counties note that even if they could close out-of-county disposal alternatives, they "would not control the siting of additional disposal alternatives ... [which] could be sited in either Minnesota or Iowa during the [Plant] life. [The Counties] would have no assurance that waste from the Count[ies] would not flow to a newly sited disposal alternative." Martin Plan at 34; Faribault Plan at 32.
 
 C. The Ordinances
 
 15
 After approving the designation plans, the Counties adopted identical designation ordinances[7] (the Ordinances), which are challenged in this case. The Ordinances, effective June 24, 1991, "requir[e] that all non-exempt mixed municipal solid waste generated within [the Counties] be delivered to [the] Facility in Truman, Minnesota." (Emphasis added). The Ordinances note that the county-guaranteed bonds which were issued to finance the Plant "are payable primarily from the net revenues or charges to be derived from the Facility, including fees paid by Haulers and Generators of Solid Waste for delivery of Solid Waste to the Facility." Martin County, Minn., Designation Ordinance; Faribault County, Minn., Designation Ordinance (Ordinances), subsection I.5. The Ordinances further state that "Designation as provided in this Designation Ordinance is necessary to assure the delivery of Solid Waste to the Facility, to assure the financial success of the Facility and to minimize the fees payable for responsible solid waste management...." Id. subsection I.10.
 
 
 16
 An exemption contained in the Ordinances allows a person owning a resource recovery plant[8] to petition for waste to be excluded from the Ordinances. The county petitioned "shall grant the petition if it determines that: a) the materials will in fact be processed ... and b) the exclusion can be implemented without impairing the financial viability of the Facility...." Id. subsection IV.5 (emphasis added).
 
 D. Procedural History
 
 17
 Waste Systems brought an action in district court against the Counties, claiming, inter alia, the Ordinances interfere with Waste Systems' right to compete in interstate commerce in violation of the Commerce Clause, deprive Waste Systems of substantive due process of law, and violate Waste Systems' civil rights under 42 U.S.C. § 1983. Waste Systems subsequently sought summary judgment with respect to the Commerce Clause claim, and the Counties sought summary judgment with respect to all claims.
 
 
 18
 The district court granted Waste Systems' motion for summary judgment on the Commerce Clause claim and permanently enjoined enforcement of the Ordinances. It found the Ordinances discriminated against interstate commerce and were enacted as a protectionist measure. See Waste Sys. Corp. v. County of Martin, Minn., 784 F.Supp. 641, 644-45 (D.Minn.1992). Because the court enjoined enforcement of the Ordinances under the Commerce Clause, it did not address Waste Systems' due process claim. See id. at 646. The court also denied the Counties' motion for summary judgment on the § 1983 claim. See id. at 646-47. Pursuant to Federal Rule of Civil Procedure 54(b), the court granted final judgment with respect to all claims.
 
 II. STANDARD OF REVIEW
 
 19
 We review the district court's granting of summary judgment de novo. See Gregory v. City of Rogers, 921 F.2d 750, 751 (8th Cir.1990). We examine the Ordinances under the law established by City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and In re Southeast Ark. Landfill, Inc. v. State of Ark., 981 F.2d 372 (8th Cir.1992). We reject the balancing test under Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), as inapplicable to this case.
 
 III. THE COMMERCE CLAUSE CLAIM
 A. Commerce Clause Law
 
 20
 The Commerce Clause of the United States Constitution states that "Congress shall have the Power ... to regulate Commerce ... among the several states." U.S. Const. art. I, § 8. The Supreme Court has also recognized a "dormant" component to the Commerce Clause: in the absence of express regulation from Congress, the clause acts as a limitation on a state's power to discriminate against interstate commerce. Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979).
 
 
 21
 When a regulation treats inter- and intrastate commerce evenhandedly in order to accomplish a legitimate local public interest and any corresponding effects on interstate commerce are incidental, the regulation does not violate the Commerce Clause unless the burden imposed on interstate commerce is excessive in relation to the local benefits. Pike, 397 U.S. at 142, 90 S.Ct. at 847. However, regulations that operate as economic protectionism and serve to protect in-state economic interests at the expense of out-of-state competitors are per se invalid. City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535; see In re Southeast Ark. Landfill, 981 F.2d at 375. The crucial inquiry is whether the regulation at issue "is basically a protectionist measure or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535.
 
 B. Analysis
 
 22
 We turn next to the Ordinances. Under the Ordinances, all designated waste, which includes all compostable solid waste, may not be transported out of the Counties, and must be delivered to the Plant.
 
 
 23
 We note that the Commerce Clause applies to the Ordinances. The interstate movement of solid waste is "commerce" under the Commerce Clause. City of Philadelphia, 437 U.S. at 622-23, 98 S.Ct. at 2535. Cases concerning the interstate movement of waste which previously have come before the Supreme Court and this court have involved attempts by states to restrict importation of out-of-state waste, thus conserving in-state landfills. See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, --- U.S. ----, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); City of Philadelphia, 437 U.S. 617, 98 S.Ct. 2531; In re Southeast Ark. Landfill, 981 F.2d 372. The case before us now involves ordinances which prevent export of in-state waste to out-of-state facilities. This difference, however, is of no consequence. Regulations which restrict transporting waste out of a state also are subject to the limitations of the Commerce Clause. See Hughes, 441 U.S. at 336-37, 99 S.Ct. at 1737; City of Philadelphia, 437 U.S. at 628, 98 S.Ct. at 2537.
 
 
 24
 That the Counties' Ordinances purport only to prevent the flow of waste across county in-state borders does not change the effect the Ordinances have on interstate commerce. As the Supreme Court recently reaffirmed, a county "may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."[9] Fort Gratiot, --- U.S. ----, 112 S.Ct. at 2024; see In re Southeast Ark. Landfill, 981 F.2d at 375-77.
 
 
 25
 1. Discrimination Against Interstate Commerce
 
 
 26
 The Counties argue that the Ordinances should be examined under Pike v. Bruce Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under Pike, regulations which treat inter- and intrastate commerce evenhandedly to accomplish legitimate local interests with only incidental effects on interstate commerce are upheld unless the burden on interstate commerce is excessive in relation to the local benefits. Id. at 137, 90 S.Ct. at 844. When a court determines whether a regulation should be examined under Pike, the first requirement is that the regulation must treat intra- and interstate commerce evenhandedly. In other words, it must not overtly discriminate against interstate commerce. The Ordinances fail this first requirement, and the Pike test does not apply.
 
 
 27
 The Counties argue the Ordinances are evenhanded, and therefore do not discriminate against interstate commerce. To support this argument, they point to the Ordinances' provision under which they claim an out-of-state resource recovery plant similar to the Counties' Plant could seek exclusion from the Ordinances. The exclusion "shall be granted" if certain conditions are met, one of which is that "the exclusion would not impair the financial viability of the Facility." The Counties contend, however, that an exclusion could be granted even if one of the conditions was not met.[10] Consequently, they argue, the discrimination is not against interstate commerce, it is only between landfills, which may not apply for an exclusion, and resource recovery facilities, which may. We disagree.
 
 
 28
 The Counties have not "artlessly disclose[d] an avowed purpose to discriminate." Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Therefore, to determine whether the Ordinances discriminate, we examine their overall effect on local and interstate commerce. Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Additionally, "when considering the purpose of a challenged statute, [the] Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (quoting Lacoste v. Louisiana Dep't of Conservation, 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)).
 
 
 29
 The provision regarding application for exemption is illusory. There presently are no resource recovery facilities within reasonable hauling distance of the Counties that qualify for exclusion, and the cost of constructing such a plant is astronomical, as the $8,000,000 price tag of the Plant demonstrates. As a result, the likelihood that a resource recovery plant would apply for an exclusion is virtually nonexistent. "If the object of [the Counties] had been to obstruct the [export of all compostable solid waste], that object will be accomplished if the statute before us be enforced." Brimmer v. Rebman, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862 (1891). The Ordinances discriminate against interstate commerce. They, in practice, entirely forbid transport of waste out of the Counties, and thus "overtly block[ ] the flow of interstate commerce at [the Counties'] borders." City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535; see Hughes, 441 U.S. at 336, 99 S.Ct. at 1736.
 
 
 30
 Additionally, the Ordinances' burden on interstate commerce is not incidental. Under the Ordinances, 10,400 tons of waste per year, which is approximately 40% of the Counties' solid waste, is barred from interstate commerce.[11] Waste Systems' "tipping fee," which is the fee a waste hauler pays to dispose of a load of waste at its Iowa landfill, is approximately $30 per ton. The value to Waste Systems of this barred waste, therefore, is $312,000 per year. The Ordinances directly burden interstate commerce by transferring this amount from interstate commerce to the financial support of the Plant.
 
 
 31
 The Counties contend any burden on interstate commerce is incidental because the financial burden of the Plant does not rest on interstate commerce. They argue the burden is on the citizens and waste generators in the Counties, who are paying $72 per ton[12] to dispose of waste at the Plant rather than the $30 per ton they would pay at Waste Systems' landfill. The Counties are correct that part of the burden of financing the Plant rests on the citizens and waste generators in the Counties, and these citizens and waste generators in fact pay more for waste disposal under the Ordinances. Because the Ordinances remove compostable solid waste from interstate transport, however, the tipping fees this waste would earn--$30 per ton--are removed from interstate commerce. Interstate commerce, therefore, pays $30 of the $72 per ton paid to the Plant. This, admittedly, is not the entire financial burden of the Plant. It is, however, not an incidental burden.
 
 
 32
 We find that the Ordinances discriminate against interstate commerce. Additionally, the burden on interstate commerce is not incidental. Therefore, we reject the Counties' argument that the Ordinances should be examined under Pike.
 
 2. Economic Protectionism
 
 33
 Analysis of the evidence before this court demonstrates that the Ordinances are economic protectionist measures, and therefore are per se invalid under City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535.
 
 
 34
 The purpose behind a regulation is not necessarily dispositive when determining whether it impermissibly discriminates against or incidentally burdens interstate commerce because "the evil of protectionism can reside in legislative means as well as legislative ends." City of Philadelphia, 437 U.S. at 626, 98 S.Ct. at 2536-37. In other words, even if the Counties acted out of legitimate environmental concern when constructing the Plant, the purpose of the Plant is not the same as the purpose of the Ordinances. The Ordinances frankly state the reason for their enactment: "Designation is necessary ... to assure the financial success of the Facility and to minimize the fees payable for responsible solid waste management...." Ordinances, subsection I.10.
 
 
 35
 The Counties' designation plans further demonstrate the Ordinances are an economic protectionist measure. The plans also state that "Designation of the Facility is necessary for financial support for both the initial development and the successful operation of the Facility." Martin Plan at 23; Faribault Plan at 21. When discussing less restrictive methods of assuring waste delivery, the plans repeatedly note a major reason these less restrictive methods were not financially feasible: cheaper disposal alternatives exist in Iowa and adjoining counties.
 
 
 36
 By mandating that all compostable solid waste be delivered to the Plant, the Ordinances insulate the Plant from competition with cheaper out-of-state alternatives. The Plant director, Dennis Hanselman, has admitted that the effect of the Ordinances is to give the Prairieland facility a competitive advantage as it relates to Iowa facilities. The Ordinances' demonstrated "purpose is not regulation with a view to safety or to conservation of the [environment], but the prohibition of competition." Buck v. Kuykendall, 267 U.S. 307, 315, 45 S.Ct. 324, 326, 69 L.Ed. 623 (1925). This is not permissible. "[O]ur economic unit is the Nation.... [T]he states are not separable economic units." H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-38, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949). "It has long been the law that States may not 'build up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States.' " Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 272, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984) (quoting Guy v. Baltimore, 100 U.S. 434, 443, 25 L.Ed. 743 (1880)).
 
 
 37
 We find that the Ordinances operate as economic protectionism, serving to protect in-state economic interests at the expense of out-of-state competitors. Therefore, the Ordinances are per se invalid. City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535.
 
 3. Environmental Protection Defense
 
 38
 The Counties contend that under Fort Gratiot and Chemical Waste Management, Inc. v. Hunt, --- U.S. ----, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992), if a state has a legitimate health or safety reason for a regulation affecting interstate commerce, then that is enough to justify upholding the regulation. They argue that the Ordinances are directed toward the environmental concern of reducing the amount of waste that is landfilled,[13] and therefore should be upheld. We reject this argument.
 
 
 39
 Fort Gratiot and Chemical Waste did not alter the rule established in City of Philadelphia that economic protectionist regulations are per se invalid. See City of Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535. Although the purpose behind constructing the Plant may have included legitimate environmental concerns, the purpose behind the Ordinances is solely economic. Enjoining the Ordinances will not negatively affect the environment. The Plant director has stated that the Plant will continue to operate whether or not the Ordinances are enjoined, and waste will continue to be processed. Enjoining the Ordinances will affect only financing of the Plant and payment of the county-guaranteed bonds.
 
 
 40
 Finally, amici curiae contend the Ordinances do not violate the Commerce Clause because Congress in RCRA authorized such state and local regulations. This court recently recognized and foreclosed this argument. When discussing a statute which restricted the flow of out-of-state waste to in-state disposal facilities, this court stated that "RCRA does mandate a system of regional planning by the states, and the statutes involved in this case are responses to that mandate. But nothing in RCRA or any other federal statute comes close to authorizing different treatment of out-of-state waste." In re Southeast Ark. Landfill, 981 F.2d at 377. The same principle applies in this case. Nothing in RCRA authorizes preferential treatment for in-state waste disposal facilities.
 
 
 41
 We find that the Counties' Ordinances discriminate against interstate commerce and are economic protectionist measures that violate the Commerce Clause. We sympathize with the Counties' efforts to establish a system of waste management. However, we must decide in accord with the principles of the dormant Commerce Clause.
 
 IV. SUBSTANTIVE DUE PROCESS CLAIM
 
 42
 The district court did not reach the merits of Waste Systems' substantive due process claim. Because we find the Ordinances are invalid under the Commerce Clause, we also find we do not need to address the merits of the substantive due process claim.
 
 V. 42 U.S.C. § 1983 CLAIM
 
 43
 The Supreme Court has held that Commerce Clause plaintiffs can proceed under 42 U.S.C. § 1983. Dennis v. Higgins, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). We have found that the Counties' Ordinances violate the Commerce Clause. Therefore, we affirm the district court's holding that granting the Counties' motion for summary judgment is inappropriate. We remand for further proceedings on Waste Systems' § 1983 claim.
 
 VI. CONCLUSION
 
 44
 We find the Counties' Ordinances violate the Commerce Clause, affirm the district court's permanent injunction against their enforcement, and remand to the district court for further proceedings on Waste Systems' 42 U.S.C. § 1983 claim.
 
 
 
 *
 THE HONORABLE BRUCE M. VAN SICKLE, Senior United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota
 
 
 [2]
 Solid waste is processed at the Plant in the following manner: Solid waste is separated into organic and nonorganic matter. The organic matter is placed in a building where it is stored in silos and turned by paddle wheels. After approximately 28 days, the waste is transferred to a building for two months where air is forced through the waste. The end product is a compost which may be used as a soil conditioner. Of the volume of waste which originally enters the Plant, approximately one-third becomes compost, one-third is transformed into water vapor and carbon dioxide, and one-third cannot be composted and is placed in a landfill
 
 
 [3]
 Faribault County had a landfill which closed in May 1990
 
 
 [4]
 Landfills are disposal facilities where solid waste is buried directly in the ground. "Sanitary landfilling is a controlled burial operation which is intended to protect the public health, minimize environmental impacts, and prevent nuisance conditions." Solid Waste Management Study for Faribault County at V-12
 
 
 [5]
 Waste Systems' landfill conforms to the regulations set by the State of Iowa for sanitary landfills, and has a disposal capacity of 30 to 50 years
 
 
 [6]
 The designation plans were prepared for the purpose of exploring the issues surrounding designation before the Ordinances were enacted. They were part of a three-step process to enact the Ordinances, but are not actually part of the Ordinances. The Counties first formulated and approved solid waste management plans, which were approved by a state agency. Next, the Counties prepared and approved the designation plans, which were reviewed and approved by the Minnesota State Office of Waste Management. Finally, the Counties drafted and enacted the Ordinances. Although the designation plans are not at issue in this case, we include portions of them to demonstrate the economic purposes of the Ordinances
 
 
 [7]
 The Ordinances were adopted pursuant to the Minnesota Waste Management Act of 1980, Minn.Stat. ch. 115A, which is not challenged. The Waste Management Act purports to be in response to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq. (RCRA). We note, as discussed infra, that RCRA does mandate regional planning for waste by the states, but does not authorize states to treat out-of-state waste or interests differently. See In re Southeast Ark. Landfill, Inc. v. State of Ark., 981 F.2d 372, 377 (8th Cir.1992)
 
 
 [8]
 A resource recovery plant is a waste facility at which "materials, substances, energy, or other products contained within or derived from waste" would be reclaimed "for sale, use, or reuse." Ordinances, subsection II.18-19
 
 
 [9]
 Fort Gratiot was decided after the Counties' brief was filed in this case. The Counties originally had argued that the Ordinances treated out-of-state interests no different than out-of-county interests, but withdrew that argument in their reply brief, after Fort Gratiot was decided
 
 
 [10]
 We note that one of the reasons the Counties desired the Ordinances was to prevent any waste from flowing to "newly sited disposal alternatives." Martin Plan at 34; Faribault Plan at 32. The definition of "disposal alternatives" necessarily would include any resource recovery facilities
 
 
 [11]
 The Counties point out that 60% of the total waste stream, or 15,900 tons, is still available in interstate commerce under the Ordinances. This is the amount of waste which is recyclable, cannot be composted, or is the unusable residual separated at the Plant
 We note this does not lessen the discriminatory effect of the Ordinances. The fact that some waste may be transported out of the Counties "merely reduce[s] the scope of the discrimination; for all categories of waste not excepted ... the discriminatory ban remain[s] in place." Fort Gratiot, --- U.S. at ----, 112 S.Ct. at 2025.
 
 
 [12]
 The tipping fee at the Plant is $50 per ton, and waste generators in the Counties pay an additional $22 per ton service fee. The total charge for waste disposal at the Plant, therefore, is $72 per ton
 
 
 [13]
 We note that the evidence before this court demonstrates that the composting method used at the Plant is "still unproven in the Midwestern United States and the environmental effects are as yet undetermined," Solid Waste Management Plan for Martin County at 126, and composting is "not risk free," Environmental Risk Discussion of Solid Waste Management Systems, prepared by the Staff of the Minnesota Pollution Control Agency, at 19. Although the director of the Plant states the Plant is operating as it should, it has been in operation only a short while, and any long-term environmental effects have not yet been determined
 We note also that the Counties and amici curiae refer to Waste Systems' landfill as "unlined," and argue that it is environmentally unsound. We have reviewed the entire record, and find no evidence that Waste Systems' landfill is an environmental danger. Waste Systems' landfill meets and exceeds Iowa's standards as a lined landfill, and conforms to Iowa's regulations for sanitary landfills. Additionally, Iowa's landfills or effects of landfilling on Iowa are not a legitimate concern for the Counties.