47 F.3d 263
 40 ERC 1102, 63 USLW 2499, 25 Envtl.
L. Rep. 20,967
 SDDS, INC., a South Dakota corporation, Appellant,
v.
STATE OF SOUTH DAKOTA; Mark W. Barnett, Attorney General of
the State of South Dakota; Walter D. Miller, as Governor of
the State of South Dakota; Joyce Hazeltine, Secretary of
State of the State of South Dakota, Appellees,
Action for the Environment, Intervenor Below.
 No. 94-1688.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 15, 1994.
Decided Feb. 6, 1995.
 
 Edward T. Lyons, Jr., Denver, CO. (David E. Driggers and Thomas J. Burke, Jr., on the brief), for appellant.
 Roxanne Giedd, Asst. Atty. Gen., Pierre, SD (Diane Best, Asst. Atty. Gen., on the brief), for appellee.
 Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and BEAM, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 South Dakota Disposal Systems, Inc., (SDDS) appeals the district court's grant of summary judgment to the defendants, the State of South Dakota and various state officials (collectively, "South Dakota"), and its denial of SDDS's cross-motion for summary judgment. At issue in this Sec. 1983 suit is whether the referendum of a measure permitting SDDS to operate a large-scale municipal solid waste disposal (MSWD) facility in South Dakota violates the dormant commerce clause or SDDS's rights to due process and equal protection. Because we find that the referendum was the latest in a series of protectionist roadblocks erected by South Dakota, we hold that the referendum violates the dormant commerce clause. Accordingly, we reverse.[1]
 
 I. BACKGROUND
 
 2
 This appeal is the latest in a seemingly never-ending series of cases arising from SDDS's six-year-long struggle to develop a large-scale MSWD facility near Edgemont, South Dakota. In November 1988, SDDS filed with the South Dakota Department of Water and Natural Resources (DWNR)[2] an application for a permit to site, construct and operate a MSWD facility (the Lonetree facility). At the time, South Dakota's administrative permitting procedure for SWD facilities was to issue a one-year initial permit if the facility was determined to be environmentally safe and in the public interest, then to issue five-year renewals of that permit after de novo review of the safety of the facility. See S.D.Codified Laws Sec. 34A-6-1.16 (1986 & Supp.1989). After much judicial[3] and political[4] wrangling, the Board of Minerals and the Environment (BME), a branch of the DWNR, held a hearing on whether SDDS's application should be granted. The BME determined that the Lonetree facility was environmentally safe and in the public interest, as required by S.D.Codified Laws Sec. 34A-6-1.13 (1986 & Supp.1989), and issued the initial one-year permit on September 9, 1989. While the one-year permit was in effect, SDDS applied for a five-year renewal permit. The BME conducted additional hearings and issued the renewal permit in December 1990 based on independent findings that the Lonetree facility was safe and in the public interest.
 
 
 3
 SDDS's two permits have generated much litigation. In In re Application of SDDS, Inc., for a Solid Waste Permit, 472 N.W.2d 502 (S.D.1991) (SDDS I ), the South Dakota Supreme Court held that when the BME issued the original one-year permit, it did not make sufficient factual findings from which the court could determine whether the Lonetree facility was in the public interest. The court remanded for factual findings,[5] but did not address the merits of whether the facility was in fact in the public interest. 472 N.W.2d at 512. In In re 1990 Renewal Application of SDDS, Inc., 507 N.W.2d 702 (S.D.1993) (SDDS IV ), the South Dakota Supreme Court held that the renewal permit was void from its inception because the original one-year permit was found invalid in SDDS I. SDDS IV, 507 N.W.2d at 703-04.
 
 
 4
 Meanwhile, South Dakota voters addressed SDDS's attempt to develop the Lonetree facility by placing an initiative on the November 1990 ballot. This initiative required legislative approval of any large-scale SWD facility in addition to the administrative approval required of all SWD facilities regardless of size. Legislative approval was conditioned upon a finding that the facility was environmentally safe and in the public interest. Under South Dakota law, the Secretary of State is required to publish a pamphlet containing an Attorney General's explanation of, S.D.Codified Laws Sec. 12-13-9 (1982 & Supp.1994), and public comment on, S.D. Codified Laws Sec. 12-13-23 (1982 & Supp.1994), each initiated or referred measure. South Dakota stated at oral argument that this pamphlet is part of the legislative history of these initiated and referred measures. The Attorney General's explanation of the November 1990 initiative stated that it would apply retroactively to existing facilities (i.e., the Lonetree facility), and that only one facility (i.e., the Lonetree facility) would be affected. The initiative was passed in the November 1990 election, and is codified at S.D.Codified Laws Sec. 34A-6-53 to 56 (1992).
 
 
 5
 Shortly after the initiative was passed, the South Dakota legislature passed, and the governor signed, 1991 S.B. 169, codified at S.D.Codified Laws Sec. 34A-6-57 (1992), which gave the required legislative approval to the Lonetree facility. A referendum on S.B. 169 was certified on May 8, 1991. The Attorney General prepared an explanation of S.B. 169 and published arguments pro and con. The Attorney General's explanation states that the legislature found the facility to be environmentally safe and in the public interest and that the DWNR permits were "declared invalid in a court decision." The three-sentence "pro" statement mentions public support for the facility in the Edgemont area, the issuance of permits by the DWNR and the legislature, and the economic impact of the facility.
 
 
 6
 The "con" statement is the most significant part of the explanatory pamphlet in terms of length and impact. Because of the importance of this statement, we set it out at length:
 
 
 7
 Referred Law # 1 is a direct public vote on the Lonetree mega-garbage dump near Edgemont. South Dakota Disposal Systems, Inc. (SDDS), Lonetree's owner, has stated 95% of the waste will come from out-of-state. The Board of Minerals and Environment and the legislature gave SDDS approval to bring in 65 railroad cars of garbage per day, seven days per week.
 
 
 8
 ACTion for the Environment has referred that approval to a vote because South Dakota is not the nation's dumping grounds. A "NO" vote will prevent Lonetree from operating, and keep its imported garbage out of South Dakota.
 
 
 9
 The U.S. Environmental Protection Agency has stated that all landfills eventually deteriorate, and new technologies only delay leaks further into the future (Federal Register, August 30, 1988). NIMBY (not in my backyard) exists because people do not want their soil, air and water contaminated.
 
 
 10
 ....
 
 
 11
 ... Lonetree is not an option for South Dakota communities. It is an out-of-state dump.
 
 
 12
 To the extent we become the nation's dumping grounds, we undermine successful recycling efforts elsewhere. Vote "NO" on Lonetree.
 
 
 13
 Appellant's Add. at 38. In November 1992, the referred measure was defeated, effectively vetoing the Lonetree facility.[6] SDDS, Inc. v. South Dakota, 994 F.2d 486, 489 (8th Cir.1993) (SDDS V ).
 
 
 14
 These legislative activities spawned several additional lawsuits. SDDS challenged the initiative that required dual legislative and administrative approval. In SDDS, Inc. v. State, Civ. Case No. 90-412 (S.D. 6th Cir.Ct. Oct. 31, 1991) (SDDS III ), South Dakota state judge Steven L. Zinter upheld the initiative against several attacks virtually identical to those now mounted against the referendum. Judge Zinter's decision in SDDS III was not appealed.
 
 
 15
 All these events bring us to the procedural history of this case in the federal courts. This appeal is the second time we have encountered the referendum. In SDDS V, we reversed the district court's grant of summary judgment for South Dakota and remanded the case for further proceedings. The issue resolved in SDDS V was whether Judge Zinter's decision concerning the legality of the initiative (SDDS III ) precluded litigation of the legality of the referendum (SDDS V ) under the doctrine of collateral estoppel. We held that it did not. On remand, the district court granted summary judgment for South Dakota a second time, holding that there was no due process violation because SDDS had no affected property interest, no commerce clause violation and no equal protection violation. 843 F.Supp. 546, 562 (D.S.D.1994). SDDS's cross-motion for summary judgment was denied. This appeal followed.
 
 II. DISCUSSION
 
 16
 A. The General Framework: Varying Levels of Scrutiny
 
 
 17
 The Supreme Court has established a two-step approach to the dormant commerce clause. The first step requires us to determine whether a challenged state measure discriminates against out-of-state articles (i.e., is a protectionist measure). Discrimination may take one of three forms. See Chemical Waste Mgmt. v. Hunt, 504 U.S. 334, ---- n. 6, 112 S.Ct. 2009, 2015 n. 6, 119 L.Ed.2d 121 (1992) (noting three types of discrimination); Southern States Landfill v. Georgia DNR, 801 F.Supp. 725, 730-31 (M.D.Ga.1992) (finding statute discriminatory on its face, in purpose and in effect); Waste Recycling v. Southeast Ala. Solid Waste Disposal, 814 F.Supp. 1566 (M.D.Ala.1993), affirmed, 29 F.3d 641 (11th Cir.1994). First, a measure may facially discriminate against out-of-state articles. See, e.g., Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (facial discrimination where state statute prohibited importation of waste "which originated or was collected outside the territorial limits of the State"); Hughes v. Oklahoma, 441 U.S. 322, 336-37, 99 S.Ct. 1727, 1736-37, 60 L.Ed.2d 250 (1979) (facial discrimination where state statute provided that no one "may ship or transport minnows for sale into this state from an outside source"); In re Southeast Ark. Landfill, Inc., 981 F.2d 372, 373 (8th Cir.1992) (facial discrimination where state statute divided state into eight districts and restricted receipt of waste originating "outside of the District in which [a landfill] is located"); Waste Sys. Corp. v. County of Martin, Minn., 985 F.2d 1381, 1386 (8th Cir.1993) (facial discrimination where ordinance required disposal of MSW generated within county at in-county disposal facility). No one contends that the referendum is facially discriminatory. However, facial discrimination is merely one of the ways in which a state may "artlessly disclose an avowed purpose to discriminate." Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).
 
 
 18
 The other two forms of discrimination are more subtle and require us to examine the overall effect of the challenged measures.[7] Waste Sys. Corp., 985 F.2d at 1386. A second way in which a challenged measure may discriminate is that a facially neutral measure may have a discriminatory purpose. See, e.g., Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 352-53, 97 S.Ct. 2434, 2446-47, 53 L.Ed.2d 383 (1977) (discriminatory purpose where facially neutral state statute prohibiting state grading from appearing on apple boxes discriminated against Washington apples that carry state grades). Third, a facially neutral measure may have a discriminatory effect. See, e.g., Maine v. Taylor, 477 U.S. 131, 148 n. 19, 106 S.Ct. 2440, 2453 n. 19, 91 L.Ed.2d 110 (1986) (discriminatory effect may be found where state "respond[s] to legitimate local concerns by discriminating arbitrarily against interstate trade"); GSW, Inc. v. Long County, Ga., 999 F.2d 1508, 1517 (11th Cir.1993) (discriminatory effect where county imposed 150-mile restriction on origin of waste); Government Suppliers Consol. Serv. v. Bayh, 975 F.2d 1267, 1278-79 (7th Cir.1992) (discriminatory effect where state statute imposed "backhaul ban" and additional registration and stickering requirements), cert. denied, --- U.S. ----, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993).
 
 
 19
 At the second step of the analysis, we apply the appropriate level of scrutiny. The Supreme Court has established two levels of scrutiny. The determinative factor is the presence or absence of discrimination against interstate commerce. If the state measure is discriminatory, it is subjected to the "strictest scrutiny," Oregon Waste Sys., Inc. v. Department of Envtl. Quality of the State of Oregon, --- U.S. ----, ----, 114 S.Ct. 1345, 1351, 128 L.Ed.2d 13 (1994) (quoting Hughes, 441 U.S. at 337, 99 S.Ct. at 1736-37), and a "virtually per se rule of invalidity" applies. Oregon Waste Sys., --- U.S. at ----, 114 S.Ct. at 1351 (quoting Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535-36); Southeast Ark. Landfill, 981 F.2d at 375.[8] If "other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade," the measure is subjected to a more flexible balancing test. Pike v. Bruce Church, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); Philadelphia, 437 U.S. at 624, 98 S.Ct. at 2535-36; Waste Sys. Corp., 985 F.2d at 1385-86; Southeast Ark. Landfill, 981 F.2d at 375. We address each of these two steps in turn.
 
 
 20
 B. What Level of Scrutiny: Is there discrimination?
 
 
 21
 Although the referendum is not facially discriminatory, we find that the referendum was certified and that the referred measure was defeated for a discriminatory purpose. We also find that the referendum has a discriminatory effect against interstate commerce. We therefore apply the "strictest scrutiny" to the referendum.
 
 
 22
 1. Does the referendum have a discriminatory purpose?
 
 
 23
 The presence of a discriminatory purpose is one of three ways to trigger strict scrutiny. Hunt, 432 U.S. at 352-53, 97 S.Ct. at 2446-47; Chemical Waste Mgmt., --- U.S. at ---- n. 6, 112 S.Ct. at 2015 n. 6; Waste Sys. Corp., 985 F.2d at 1381. The record is replete with direct and indirect evidence of an avowed discriminatory purpose behind the referendum.
 
 
 24
 The record contains two pieces of direct evidence of a discriminatory purpose. First, in SDDS III, Judge Zinter noted that the initiative "was purposely drafted to insure that, except for Lonetree, the Initiated Measure would not apply to existing or foreseeable future landfills that dispose of South Dakota waste." Appellant's App. at 184. The dual administrative and legislative approval required by the initiative was specifically designed and intended to hinder the importation of out-of-state waste into South Dakota. The purpose of the first and only referendum under the initiative cannot be divorced from the purpose of the initiative itself. The initiative was drafted to defeat a specific "out-of-state dump" by requiring an additional approval, and the referendum concerns that very approval for the same "out-of-state dump." We believe that the discriminatory purpose behind the initiative infected the referendum as well. Second, the legislative history of the referred measure is brimming with protectionist rhetoric. The state-sponsored pamphlet that accompanied the referendum contained a "con" statement that exhorted voters to vote against the "out-of-state dump" because "South Dakota is not the nation's dumping grounds," and "[a] 'NO' vote will prevent Lonetree from operating, and keep its imported garbage out of South Dakota." This is ample evidence of a discriminatory purpose to trigger strict scrutiny.
 
 
 25
 In addition to this direct evidence of a discriminatory purpose, there is substantial indirect evidence that the referendum was motivated by a discriminatory purpose. In Hunt, the Supreme Court found "it somewhat suspect" that the means used to achieve the state's "ostensible ... purpose" were relatively ineffective. Hunt, 432 U.S. at 352, 97 S.Ct. at 2446. Likewise, South Dakota has employed a highly ineffective means to pursue its ostensible purpose of environmental protection. After the initiative passed, a large-scale MSWD facility in South Dakota was required to obtain two things: an administrative permit and legislative authorization. South Dakota argues that large MSWD facilities generally pose a greater risk to the environment than do smaller facilities. We will assume for the sake of our decision that this is true. However, although the general difference in risk between larger and smaller facilities justifies a general requirement of legislative approval for large MSWD facilities, a general difference in risk, without more, is insufficient to support a particular denial of legislative approval. South Dakota must demonstrate not only that there are legitimate interests justifying the general requirement of dual approval, but it must also show that this particular review furthered those goals. Although SDDS III establishes that requiring both administrative and legislative approval for large facilities is permissible because the difference in risk between large and small facilities is a legitimate state interest, South Dakota has completely failed to demonstrate that the referendum that denied legislative approval for the Lonetree facility in any way furthered the state's legitimate concerns with safety and environmental protection.
 
 
 26
 South Dakota's most significant environmental protection device is the administrative permitting process for SWD facilities. Anyone who sites, develops or operates a SWD facility in South Dakota must obtain a permit from the DWNR. S.D.Codified Laws Sec. 34A-6-1.4 (1992). SDDS sought a permit for the Lonetree facility from the DWNR, and when the permit was contested, the BME held hearings to determine whether the Lonetree facility was environmentally safe and in the public interest. The permit was granted, appealed, remanded, reissued, reappealed, renewed, and ultimately voided. The fact that SDDS's permit for the Lonetree facility was so carefully scrutinized indicates that the administrative permitting process is a relatively effective means of environmental protection. In fact, South Dakota admits that the Lonetree facility is safe and in the public interest if operated in accordance with the DWNR permit conditions. Appellant's App. at 165. Thus, the benefit of the added requirement of legislative approval is not that the legislature provides the sole means by which South Dakota protects its environment from potentially unsafe SWD facilities. Rather, the legislative approval provides a second opportunity to review the proposed facility. Thus, the dual process provides an incremental benefit over the administrative process alone to the extent that the legislature is able to detect unsafe facilities that are not detected by the DWNR.
 
 
 27
 Because the benefit of legislative review is that it screens out unsafe large facilities that survived the administrative review process, the benefit of each legislative review is directly proportional to the amount of scrutiny of the environmental effects of the proposed facility that occurs in that review.[9] The challenged referendum cannot be said to have provided any benefits because the body that disapproved the Lonetree facility (i.e., the South Dakota electorate) was provided with: (1) no standards or information to use to evaluate the benefits and risks of the Lonetree facility; and (2) information that leads to an unreliable result. South Dakota has admitted that there were no standards to guide the electorate. Appellant's App. at 166. Indeed, in SDDS III, Judge Zinter noted that the referral was a "standardless review by the electorate." Appellant's App. at 207 n. 9. The voters simply voted yes or no without any criteria and with severely limited information to guide them in evaluating the effects of the Lonetree facility. Thus, because the voters were not provided with any meaningful criteria, the defeat of the referred measure cannot be seen as improving environmental protection.
 
 
 28
 Additionally, voters were bombarded with protectionist propaganda that renders the result of the referendum unreliable as an environmental review. The legislative history of the referred measure consists largely of the state-sponsored explanatory pamphlet that contains an official explanation and arguments pro and con. Since the referred measure was defeated, the "con" statement is the most important. See Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 680, 101 S.Ct. 1309, 1321, 67 L.Ed.2d 580 (1981) (Justices Brennan and Marshall, concurring in judgment) (noting that dispositive issue is lawmakers' assessment of benefits and burdens). The con statement mentions general findings by the EPA that all landfills eventually degenerate, and also mentions recycling and the potential for hazardous waste dumping. However, no connection is made between these vague and general statements and the Lonetree facility. Moreover, the few specific environmental concerns that are mentioned in the middle four paragraphs are sandwiched between five paragraphs containing pleas to reject "imported garbage" and the "out-of-state dump." This protectionist concern clearly emerges as the dominant reason to reject the referred measure. The opposition begins and ends its presentation with a plea to keep South Dakota from becoming the nation's dumping grounds. Such propaganda does nothing to enhance any meaningful review of the environmental impact; it merely allows protectionism to run rampant.
 
 
 29
 South Dakota purports to seek a second review of large-scale SWD facilities that pose increased environmental risks in order to protect its natural resources, but this particular review consisted of a referendum steeped in inflammatory propaganda and does virtually nothing to further this purported goal. This indirect evidence strengthens the conclusion that the denial of approval had a discriminatory purpose, and confirms our decision that the referendum must receive strict scrutiny.
 
 
 30
 2. Does the referendum have a discriminatory effect?
 
 
 31
 Alternatively, even if South Dakota had not openly declared a discriminatory purpose, the referendum is discriminatory in its effect, and this type of discrimination will also trigger strict scrutiny.[10] Hughes, 441 U.S. at 336, 99 S.Ct. at 1736; Hunt, 432 U.S. at 352-53, 97 S.Ct. at 2446-47. Hunt applied strict scrutiny to a facially neutral statute in a situation that is analogous to the referral of S.B. 169. In Hunt, North Carolina banned the placement of any grading (other than USDA grading) on closed shipping containers of apples. This measure affected only Washington state apples (which bore Washington state grades). Thus, in Hunt, out-of-staters were singled out to bear 100% of the cost of the measure. The structure of the "garbage market" in South Dakota is such that the referendum has a discriminatory effect. South Dakota generates 600,000 to 700,000 tons of MSW each year. In addition to this in-state waste, three facilities accept out-of-state waste (they accepted 60,000 tons in 1992). As a result of the low rate of domestic waste generation and the costs of regulation, the existing disposal facilities in South Dakota are fairly small; the largest facility disposes of 125,000 tons per year. New facilities must be large scale in order to recover the costs imposed by environmental regulations. The Lonetree facility was designed to accept 1.5 million tons of MSW per year. According to the literature accompanying the referendum, 95%[11] of this waste would originate outside South Dakota.
 
 
 32
 Hunt is analogous to this appeal because both involve a facially neutral measure that exports costs to out-of-staters.[12] Hunt was a case where North Carolina sought to eliminate Washington's competitive advantages, so that North Carolina farmers could usurp part of the North Carolina apple market that belonged to Washington growers. Here South Dakota is attempting to exclude out-of-state trash that has a "negative" value, thus forcing other states to bear the cost of disposing of the trash when the market would otherwise dispose of the trash in South Dakota. Any distinction between these two species of protectionism is of no consequence. Waste Sys. Corp., 985 F.2d at 1386. Indeed, Judge Zinter noted an analogy between the initiative and Hunt in SDDS III. Appellant's App. at 182. Moreover, we note that in SDDS III, Judge Zinter specifically found that the initiative had a discriminatory effect. Slip op. at 14-15. Just as the purpose of the initiative and the referendum are intimately connected, so are the effects. Thus, because the garbage market of South Dakota is such that the referendum so predominantly affects only out-of-staters, we believe that the referendum of S.B. 169 is discriminatory in effect, and must receive strict scrutiny.
 
 C. Application of Strict Scrutiny
 
 33
 Once strict scrutiny is triggered, "the burden falls on the State to justify [the measure] both in terms of the local benefits flowing from the statute and the unavailability of a nondiscriminatory alternative adequate to preserve the local interests at stake." Hunt, 432 U.S. at 353, 97 S.Ct. at 2446-47; Chemical Waste Mgmt., --- U.S. at ----, 112 S.Ct. at 2014. We find that the referendum fails both prongs of this test because the record demonstrates that (1) the denial of legislative approval by the referendum does not further the legitimate goal of environmental safety, and therefore provides no local benefits; and (2) a nondiscriminatory alternative is available because legislative review of the Lonetree facility may be obtained without a referendum in which the predominant argument is the imported nature of the garbage at Lonetree.
 
 
 34
 In order to survive strict scrutiny under the commerce clause, South Dakota first must demonstrate that the referendum on the Lonetree facility provided some local benefits. South Dakota identifies environmental protection as the sought-after benefit. Although the goal of environmental protection is a permissible one, as we have already discussed, the referendum on S.B. 169 simply does nothing to advance this goal. Because there is already one procedure in place to protect the environment, and this second review provides only an incremental amount of additional protection, this referendum in which voters were distracted by distinctly non-environmental concerns provided no local benefit. South Dakota has not carried its burden to prove that this referendum resulted in increased environmental protection.
 
 
 35
 To survive strict scrutiny, South Dakota must also demonstrate the lack of a nondiscriminatory alternative to this referendum under the dual permitting scheme. Things such as a new administrative agency or more stringent regulations are possible alternatives, but these were rejected as alternatives to the initiative by the South Dakota state court in SDDS III. However, SDDS III addressed only the initiative. SDDS V, 994 F.2d at 493-94. We must look at alternative ways in which this particular decision regarding legislative approval might have been made. When the focus is changed from the broad focus of SDDS III to a narrower focus on this particular decision, nondiscriminatory alternatives emerge. The most obvious alternative is a legislative discussion in which interstate trade issues are not the dominant issues discussed. This alternative may be easily achieved through a fuller discussion of the environmental issues, so that the record reflects that voters or legislators might reasonably have considered the environmental issues. Such an alternative, which merely modifies the contents of the legislative discussion or the voter pamphlet accompanying a referred measure, would not be any more costly than the current procedure. The alternative would more fully achieve the desired effect of protecting the environment by forcing consideration of the environmental issues without the distortions of reasoning that result from the emphasis on protectionist propaganda.
 
 
 36
 Thus, because we hold that the referendum provided no local benefit, and that a nondiscriminatory alternative was available, we conclude that the referendum fails the required strict scrutiny. We therefore hold that South Dakota's referendum of S.B. 169 violates the dormant aspects of the commerce clause of the United States Constitution.
 
 III. CONCLUSION
 
 37
 We hold that South Dakota's referral of S.B. 169 violated the dormant commerce clause. Although facially neutral, the referendum had a discriminatory purpose and a sufficiently discriminatory effect to trigger strict scrutiny. Because we find that the referendum does not appreciably advance any legitimate local interest, and that nondiscriminatory alternatives are available to advance South Dakota's legitimate concerns, the referendum does not survive strict scrutiny. Accordingly, the judgment of the district court is reversed and we remand to the district court with instructions to enter judgment in favor of SDDS.
 
 
 
 [1]
 We express no view as to the merits of the due process or equal protection claims brought by SDDS
 
 
 [2]
 The Department has since changed its name to the Department of Environment and Natural Resources. We will use the old name throughout this opinion in the hope that it may, in some small way, simplify this appeal
 
 
 [3]
 The DWNR failed to act upon the application within 120 days, as required by S.D.Admin.R. 74:27:04:05(2). SDDS sued, and in SDDS, Inc. v. South Dakota Dep't of Water & Natural Resources, Civ. Case No. 18-179 (S.D. 6th Cir.Ct. July 5, 1989), the DWNR was ordered to act upon the application
 
 
 [4]
 After it was forced to act, the DWNR initially recommended that the application be approved. South Dakota Governor Mickelson intervened and caused the DWNR to reverse its position, resulting in a referral to the BME
 
 
 [5]
 In 1991, S.D.Codified Laws Sec. 34A-6-1.13 was amended and the implementing regulations were rewritten. Although the ultimate question of whether the facility was environmentally safe and in the public interest remained the same, several factors weighing into the agency's decision changed. On remand after SDDS I, the agency made the specific findings required by its revised regulations. The agency found the Lonetree facility to be environmentally safe, using language that parallels the applicable regulation. Appellant's App. at 117 (Finding # 52, parallelling S.D.Admin.R. 74:27:17:01). The agency found the facility to be in the public interest. Appellant's App. at 121 (Finding # 72). Both findings were preceded by numerous supporting factual findings. The revised BME findings also contain a specific legal conclusion that all requirements for the permit had been met. Appellant's App. at 122 (Conclusions of law # 3 & # 4)
 
 
 [6]
 S.B. 169 never had any effect because it would not become effective as law unless and until it passed the referendum. SDDS, Inc. v. State, 481 N.W.2d 270 (S.D.1992) (SDDS II )
 
 
 [7]
 "[T]he evil of protectionism can reside in legislative means as well as legislative ends." Philadelphia, 437 U.S. at 626, 98 S.Ct. at 2536-37. Facial discrimination generally involves a discriminatory purpose and a discriminatory effect, while the other two forms of discrimination involve one or the other
 
 
 [8]
 We (and numerous other courts) have previously stated that Philadelphia establishes a "per se rule of invalidity." Waste Sys. Corp., 985 F.2d at 1387. Although this statement may be inaccurate in a technical sense (the full quotation from Philadelphia is "a virtually per se rule of invalidity"), it accurately states the results of cases in which strict scrutiny is applied. The only way that discriminatory state action can withstand this level of scrutiny is if the state demonstrates that the out-of-state articles are more dangerous than are in-state articles. Chemical Waste Mgmt., --- U.S. at ---- - ----, 112 S.Ct. at 2014-15 (applying principle to waste); Taylor, 477 U.S. at 131, 106 S.Ct. at 2440-43. Neither party to this appeal makes any such claim
 
 
 [9]
 Viewing the benefit in this manner distinguishes the dual permitting measure from the absolute bans on large landfills that have been approved in dicta. See, e.g., Southeast Ark. Landfill, 981 F.2d at 376; Fort Gratiot Landfill v. Michigan Dep't of Natural Resources, --- U.S. ----, ----, 112 S.Ct. 2019, 2027, 119 L.Ed.2d 139 (1992). An absolute ban is analogous to a permissible quarantine law. There is a legitimate state interest in environmental protection, and the absolute ban is the best, or at least a permissible, way to achieve this goal. South Dakota's legislative review process, by contrast, although supported by the same state interest in the abstract, simply does nothing to further this purported goal. Thus, the fact that legislative review is less restrictive than an absolute ban, rather than being an asset, proves fatal
 
 
 [10]
 Despite the fact that it has previously conceded that "[t]he practical effect of the referendum was to prohibit the construction" of the Lonetree facility, Appellant's App. at 39, South Dakota now argues that because the BME permit had been revoked, the referendum had no impact, discriminatory or otherwise, on Lonetree. However, "[i]f this court were to ignore [South Dakota's] intermediary actions and look only to the result, it would reward [South Dakota] for acting unconstitutionally." GSW, Inc., 999 F.2d at 1518. Moreover, the administrative permit was voided due to a procedural defect, not because of any finding that the Lonetree facility was environmentally dangerous. Thus, Lonetree could reapply for the administrative permit, and the referendum at the very least made the Lonetree project more difficult and expensive to accomplish. The absence of a reapplication to the BME is not fatal. See Diamond Waste, Inc. v. Monroe County, Ga., 939 F.2d 941, 943 (11th Cir.1991) (applying Pike test to invalidate county's disallowance of landfill, despite absence of application required by statute)
 
 
 [11]
 SDDS III found that 90% of the waste would originate outside South Dakota. Slip op. at 3. SDDS makes similar claims
 
 
 [12]
 The fact that only 90% rather than 100% of the costs of excluding the waste fall on out-of-staters does not eliminate the discriminatory effect. This fact merely reduces the scope of the discrimination. Fort Gratiot, ---- U.S. at ----, 112 S.Ct. at 2025; Waste Sys. Corp., 985 F.2d at 1387 n. 11. The extent of the discrimination is not relevant to the prior determination whether the state has discriminated against interstate commerce. Wyoming v. Oklahoma, 502 U.S. 437, 455-56, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992). In a similar vein, the fact that South Dakota later chose to permit importation of waste by the Big Stone plant goes only to the extent of the discrimination, not its existence. Moreover, because the issue is the referendum that was specific to Lonetree, it is questionable whether Big Stone has any relevance at all. To determine whether there was any discrimination, we must look to the effects on the garbage market as it existed at the time of the referendum