BLUE RIBBON PROPERTIES, INC.,
dba Long Hollow Landfill,
Plaintiff–Appellant,

v.

HARDIN COUNTY FISCAL COURT;
Hardin County, Kentucky; Hardin
County Planning and Development
Commission, Defendants–Appellees.

No. 00–6345.

United States Court of Appeals,
Sixth Circuit.

Aug. 15, 2002.

Before SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

Blue Ribbon Properties, Inc., appeals the district court's orders granting summary judgment to the Hardin County Fiscal Court and the Hardin County Planning and Development Commission (collectively "the County" hereinafter) on Blue Ribbon's claims of inverse condemnation under Kentucky law, violation of the Interstate Commerce Clause, and violation of the Sherman Antitrust Act. Because we conclude that Blue Ribbon has not presented sufficient evidence to create a genuine issue of fact material to any of these claims and the defendants are entitled to judgment as a matter of law, we affirm the judgment of the district court.

I.

Burt Wilson, the president of Blue Ribbon, began to explore the possibility of opening a landfill in Hardin County, Ken-

tucky, when he learned in 1987 that Hardin County's sole landfill was scheduled to be closed in June, 1992. Wilson hired a hydrologist to ascertain what, if any, land in Hardin County was suitable for a landfill. According to the hydrologist, most of Hardin County was not suitable because of the porous nature of the bedrock underlying the County. One small portion of the County, however, a shale outcropping—called the Muldraugh escarpment—through which water would not flow, was determined to be well suited for the purpose. In 1989, Wilson purchased the 590 acres of land upon the escarpment that is the subject of this suit.

Blue Ribbon applied for a conditional use permit[1] from the Hardin County Planning and Development Commission (Commission) on October 24, 1989. Also in October 1989, Blue Ribbon submitted the required state landfill application to the Natural Resources and Environmental Protection Cabinet (Cabinet), the state agency entrusted with authority over landfills.

The Commission held five public hearings before denying Blue Ribbon's request for a conditional use permit on February 5, 1991. The Commission listed as reasons for its denial: (1) the danger that archaeological sites might be destroyed; (2) the additional traffic on county roads that were prone to flooding and were not made to withstand a high volume of heavy truck traffic; (3) high noise levels; (4) unsightly view; and (5) odor nuisance.

Blue Ribbon appealed the denial to the Hardin County Fiscal Court (Fiscal Court or Court), which is the governing body of Hardin County. The Fiscal Court, on March 11, 1991, voted to deny Blue Ribbon's application for a conditional use.

On April 10, 1991, Blue Ribbon sued in Hardin County Circuit Court challenging Hardin County's zoning ordinance and the County's denial of Blue Ribbon's application. The court ruled in April 1993 that the zoning ordinance was invalid under state law and that the County's denial of Blue Ribbon's application was unlawful. The Kentucky Court of Appeals affirmed and the Supreme Court of Kentucky denied review.

In 1991, the Commonwealth enacted legislation that required each county to create an area solid waste management plan. Ky.Rev.Stat. Ann. § 224.43 *et seq.* In the fall of 1991, while Blue Ribbon's suit was wending its way through the court system, the County purchased 1,373 acres to use as a landfill, and applied to the Cabinet for a landfill permit. Hardin County subsequently adopted its plan, which expressly excluded Blue Ribbon's proposed landfill as a viable option for the disposal of solid waste within the County.

After its victory in the state courts, Blue Ribbon again attempted to obtain a permit to operate a landfill. The Fiscal Court held a public hearing in July 1995 to determine whether Blue Ribbon's proposed landfill was consistent with the requirements of the Hardin County solid waste management plan. The Commission presented its reasons for opposing the landfill and the Fiscal Court found, for essentially the same reasons that it had denied the first application, as well as the specific exclusion of the Blue Ribbon landfill from the County's plan and the landfill that the Fiscal Court was in the process of con-

---

1. The County's zoning ordinance in effect at the time designated the entire county as one zone and designated three permissible uses for the zone: agricultural, single family residential, and conditional. Use of land for agri- cultural and single family residential purposes was as of right. A conditional use, defined as "a use of land or activity permitted only after fulfillment of all local regulations," required a permit.

structing, that it was not. On October 2, 1995, the Cabinet sent Blue Ribbon a letter explaining that, although it had the authority to overrule the Fiscal Court's denial of Blue Ribbon's application, it was unlikely to do so given the requirements of the law, the capacity needs of Hardin County and the other elements of the Hardin County plan.

Blue Ribbon then brought this action against the Fiscal Court, the Commission, and the Cabinet, asserting five claims: (1) an unconstitutional regulatory taking under the Fifth and Fourteenth Amendments; (2) a 42 U.S.C. § 1983 claim alleging a deprivation of due process and equal protection in violation of the Fourteenth Amendment; (3) a violation of the Interstate Commerce Clause; (4) violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; and (5) a state law claim for tortious interference with a prospective advantage. Blue Ribbon sought injunctive relief, compensation of $25 million, and punitive damages of $2 million.

The district court dismissed Blue Ribbon's claims against the Cabinet on the basis of Eleventh Amendment immunity. The court then granted partial summary judgment against Blue Ribbon on all of its claims except for the antitrust claims, ruling that: Blue Ribbon's federal takings claim was not ripe for adjudication because Blue Ribbon had failed to exhaust its state remedies through an inverse condemnation action; the § 1983 claim must be dismissed on collateral estoppel grounds because the district court was bound by the Hardin County Circuit Court's earlier ruling that the Fiscal Court and Commission were not "person[s]" within the meaning of § 1983; the defendants were entitled to judgment on the Commerce Clause claim because Blue Ribbon had failed to allege any facts that would show that the County "discriminated ... against out-of-state waste or landfill operators in the design

and implementation of the Hardin County Solid Waste Plan;" and under Kentucky law, the County was immune from suit on the tortious interference claim. The district court refused to grant summary judgment on the antitrust claims because the County's motion was premised solely on *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and the immunity announced in that case was not available to the Fiscal Court and Commission because they had made no showing that they had acted in accordance with a "clearly articulated and affirmatively expressed state policy" to displace competition and impose regulation or monopoly.

Blue Ribbon requested and was granted leave to amend its complaint. In the amended complaint Blue Ribbon added an inverse condemnation claim alleging that the Fiscal Court and Commission condemned Blue Ribbon's property in violation of the Federal and Kentucky Constitutions.

Following discovery, both parties moved for summary judgment and on August 28, 2000, the district court granted the County's motion. The district court first ruled that Blue Ribbon had failed to offer sufficient evidence to create a genuine issue for trial on Blue Ribbon's claim that the County had "conspired" with the Cabinet, within the meaning of Section 1 of the Sherman Act, to restrain trade or commerce. The court noted that the sole evidence introduced by Blue Ribbon was the October 2, 1995, letter from the Cabinet explaining that, although it had the authority to overrule the Fiscal Court's denial of Blue Ribbon's application, it was unlikely to do so. The court further held that Blue Ribbon had failed to satisfy its burden with regard to Section 2 of the Sherman Act because it failed to show that the County had monopolized the "relevant market" for solid waste in Hardin County.

The relevant market, the court held, was much broader than the County itself, and the Fiscal Court and Commission, with no authority outside of the County, could not monopolize and control the market. The district court rejected the new inverse condemnation claim, holding that since Blue Ribbon was not denied all beneficial use and enjoyment of its property, there was no taking.

In this timely appeal, Blue Ribbon urges us to hold that the district court erred in its determination that the County did not take Blue Ribbon's property without just compensation and consequently erred in granting summary judgment on the state law inverse condemnation claim; that the district court erred in finding that the actions of the Fiscal Court and the Commission in denying Blue Ribbon's application for a permit to construct and operate a landfill did not impermissibly burden interstate commerce; and that the district court erred in finding that the County did not seek to monopolize the relevant solid waste market in violation of Section 2 of the Sherman Antitrust Act.

## II.

We review the district court's grant of summary judgment de novo. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir.1998). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

■ Blue Ribbon argues that the Fiscal Court's and the Commission's denial of Blue Ribbon's application for the necessary permit to operate a landfill on its property was a taking under Kentucky's inverse condemnation laws because the denial deprived Blue Ribbon of "meaningful" economic use of its land. We cannot agree.

Both parties rely heavily on *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and *Commonwealth v. Stearns Coal and Lumber Co.*, 678 S.W.2d 378 (Ky.1984), to support their respective positions on Blue Ribbon's inverse condemnation claim. In *Lucas* the Supreme Court ruled that a South Carolina statute, which prevented the plaintiff from altering his beach front property in any way, had deprived the owner of "all economically beneficial or productive use of [his] land" and therefore constituted a regulatory taking requiring compensation under the Fifth Amendment. *Lucas* 505 U.S. at 1015, 112 S.Ct. 2886. The Court, through Justice Scalia, built on *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), which had held that a compensable taking occurred, even absent a direct physical appropriation, when the government regulated property to such an extent that the regulation was the "functional equivalent of a 'practical ouster of [the owner's] possession.'" *Lucas*, 505 U.S. at 1014, 112 S.Ct. 2886. Reluctant to expand the notion of regulatory takings too far for fear that government's ability to legitimately regulate aspects of the nation's economic life would be compromised, the Court repeatedly emphasized the "extraordinary" nature of a regulation that would qualify as a taking because it would allow a property owner "*no* productive or economically beneficial use of land." *Id.* at 1017, 112 S.Ct. 2886.

See also id. at 1019, 112 S.Ct. 2886 ("[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.").

In *Stearns Coal*, the Kentucky Supreme Court confronted a Kentucky statute, the Wild Rivers Act, that required designated lands to remain in their pristine state. *Stearns Coal*, 678 S.W.2d at 381. Although decided approximately eight years prior to *Lucas*, *Stearns Coal* set the same rigorous standard for regulatory takings when it analyzed the inverse condemnation action brought to force compensation from the Commonwealth. *See id.* at 382 (defining a regulatory taking as government action that "completely frustrate[s] the landowner's rights and deprive[s] him of the use of his property"). The *Stearns* Court also relied heavily on the same cases and federal law the United States Supreme Court later relied upon in *Lucas*. The Kentucky Supreme Court listed six factors used to guide courts in determining whether a taking has occurred:

> (1) the economic impact of the law on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, (3) the "character" of the governmental action, that is whether the action is a physical invasion versus a public program adjusting the benefits and burdens of economic life to promote the common good, (4) what uses the regulation permits, (5) that the inclusion of the protected property was not arbitrary or unreasonable, and (6) that judicial review of the agency decision was available.

*Id.* at 381. The court ruled that a regulation of property is not invalid simply because "it deprives a property owner of the most beneficial use of the property." *Id.* at 382. Although the Wild Rivers Act, if fully executed, could have effected a taking of plaintiff's property, the court said, the fact was the plaintiff had succeeded in having the Act's enforcement enjoined and the plaintiff had made and continued to make substantial beneficial use of its property. Therefore, no taking had occurred. *Id.* at 382–83.

We conclude that Blue Ribbon has not satisfied the *Stearns Coal* requirements to demonstrate a taking. It was Blue Ribbon's burden to present evidence sufficient to create a genuine issue for the trier of fact that there is no productive use to which Blue Ribbon can put its property or that all economically productive use of the property has been lost due to government action. Blue Ribbon has not sustained this burden. Although there does not appear to be any genuine issue with regard to Blue Ribbon's assertion that those productive uses are significantly less remunerative than the proposed landfill likely would have been, the record nonetheless demonstrates that Blue Ribbon has received an annual income from the property through agricultural and billboard leases, there is timber on the property that Blue Ribbon could presumably sell, and some of the land is suitable for farming. There is no doubt that the County's actions interfered with Blue Ribbon's investment-backed expectations, but Blue Ribbon purchased the property with the knowledge that it could not construct or operate a landfill on it without obtaining County and state permits. In denying the permit, the Fiscal Court acted pursuant to a plan it enacted pursuant to Kentucky law, and the record does not support a finding that the plan or the Fiscal Court's action were arbitrary. The County's action was not a physical invasion. Finally, judicial review was available.

We conclude that the district court did not err in granting summary judgment to

the County on the state law inverse condemnation claim.

## IV.

The Interstate Commerce Clause vests Congress with the exclusive authority to regulate commerce among the several states. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824). The Commerce Clause has a negative or dormant component that the Court has ruled generally precludes state regulation of or discrimination against interstate commerce. *Welton v. Missouri*, 91 U.S. (1 Otto.) 275, 23 L.Ed. 347 (1875). The Supreme Court has repeatedly held, however, that in the absence of congressional regulation, states have the residual authority to regulate their own affairs even if such regulation results in an incidental burden on interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

The Supreme Court has created a two-step analysis of dormant commerce clause claims. The first step requires courts to determine whether the challenged action discriminates against interstate commerce. This discrimination may take one of three forms. The challenged statute or action might: (1) facially discriminate against out-of-state goods or services, (2) have a primary purpose of discrimination, or (3) have a discriminatory effect. *See SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (8th Cir.1995) (giving an overview of dormant commerce clause jurisprudence). The second step involves determining the correct level of scrutiny applicable to the challenged governmental action. *Id.* at 268. If the statute or action by the government discriminates in any of the three ways listed above, reviewing courts will apply the "strictest scrutiny." *Or. Waste Sys., Inc. v. Dept. of Env. Quality of the State of Or.*, 511 U.S. 93, 101, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The burden, in a case where a court has found that the challenged government action discriminates, is

on the government to show that the government action "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). Here, Blue Ribbon bears the initial burden of showing that the Fiscal Court's action had a discriminatory purpose or effect on interstate commerce. *Hughes*, 441 U.S. at 336, 99 S.Ct. 1727.

Alternatively, if we determine that the Fiscal Court's denial of Blue Ribbon's application did not discriminate against interstate commerce, we must apply the balancing test announced in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In *Pike*, the Supreme Court ruled that nondiscriminatory regulations that only incidentally burden commerce are valid "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142, 90 S.Ct. 844. Therefore, a court is required to balance the purported benefits of the regulation against its impact on commerce and to determine whether the government could advance the local interest equally well through means with a lesser impact on interstate commerce. *Id.*

In essence, Blue Ribbon claims that the Fiscal Court's denial of its application for a solid waste landfill was motivated by a purpose to discriminate against out-of-state waste. As evidence of this intent, Blue Ribbon points to the Hardin County Plan's designating only seven contiguous Kentucky counties as the source of "out-of-area" waste to be received by any Hardin County landfill. Because the County's plan does not also designate non-Kentucky areas in the "out-of-area" category, Blue Ribbon argues, the Plan discriminates against interstate commerce.

Blue Ribbon also relies on statements made on three occasions by Judge Dalton, the Fiscal Court's chief officer and one of the nine persons who voted on Blue Ribbon's application, that he did not want to approve Blue Ribbon's application for fear that Hardin County would become a dumping ground for out-of-state waste. Lastly, Blue Ribbon asserts that the County's denial of Blue Ribbon's application also provides evidence of a discriminatory purpose.

The Hardin County Plan's "out-of-area" designation does not evidence either facial discrimination or a discriminatory purpose. Rather, it is a recognition of the fact that solid waste is profitably transported no more than approximately seventy-five miles (a fact not in dispute), and that this area waste management plan—formed pursuant to Kentucky law—includes only counties in Kentucky and not other states. The County was required by Kentucky law to distinguish between in-area and out-of-area waste to better enable each management area to plan for future waste disposal needs. The County has solicited its neighboring Kentucky counties to join an area management plan, as it could do under Kentucky law, and its plan therefore takes into account the waste disposal needs of those counties. Blue Ribbon has presented no evidence that the County's specific inclusion of Kentucky counties in its "out-of-area" designation constitutes an exclusion of non-Kentucky areas as possible sources of waste.

In *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532 (6th Cir.1997), we ruled that the Kentucky statute that required counties such as Hardin County to create solid waste management plans was not facially discriminatory simply because it required counties to identify capacity for out-of-area waste. The court held that a distinction between the origins of waste was not equivalent to the discrimination

between in-state and out-of-state waste prohibited by the Commerce Clause. *Id.* at 541. The court found that even if it accepted the plaintiff's contention that the "out-of-area" designation was simply another label for out-of-state waste, a contention the court rejected, the distinction was not discriminatory because it imposed no burden on the out-of-area waste. *Id.*

■ Judge Dalton's statements do not create a material issue of fact regarding a discriminatory purpose. Cases in which courts have held that a government action was motivated by a discriminatory purpose based their rulings on much more than three statements by one of nine decisionmakers. In *SDDS, Inc.*, 47 F.3d at 268–70, for example, the Eighth Circuit relied upon the legislative history of an enactment—replete with "protectionist rhetoric," the manner in which the challenged enactment was drafted, an official pamphlet with protectionist language, and the ineffective means utilized by South Dakota to achieve its purported end, to rule that the enactment was motivated by a discriminatory purpose. *Id.* Here, by contrast, Blue Ribbon relies on the deposition testimony, taken years after the fact, of one of nine voters on the Fiscal Court as its primary evidence of a discriminatory purpose. This alone is not sufficient to support an inference of purposeful discrimination. In *E. Ky. Res.*, 127 F.3d at 542–43, we rejected similar circumstantial evidence of purposeful discrimination by a governmental body holding that the plaintiff had failed "to show the effect of that evidence on the challenged statute." Likewise here, Blue Ribbon has not shown how or to what extent the purportedly discriminatory purpose of one member influenced the other eight members of the Fiscal Court.

■ The County's actions in establishing its own landfill and in denying Blue Ribbon's application are directed at a mat-

ter of local concern: the safe and efficient disposal of solid waste. The Fiscal Court justified its denial of Blue Ribbon's application by citing to the Commission's five reasons for opposing the application, and added that the proposed landfill would strain the abilities and equipment of the County's volunteer fire department. We cannot say that the burden imposed on interstate commerce by the County's denial of the permit is "clearly excessive" in light of the local concerns supporting the denial. *Pike,* 397 U.S. at 142, 90 S.Ct. 844. Indeed, Blue Ribbon has failed to demonstrate that the denial of its permit application has imposed *any* burden on interstate commerce.

We conclude that Blue Ribbon has failed to meet its burden to show that the County purposefully discriminated against interstate commerce or that the County's action fails the balancing test required by *Pike.* We therefore find that the district court did not err in granting summary judgment to the defendants on this claim.

### V.

Blue Ribbon claims that the district court erred in holding that Hardin County did not violate Section 2 of the Sherman Antitrust Act by willfully acting to acquire and maintain a monopoly. Blue Ribbon contends that for purposes of this claim, the relevant market is Hardin County because of the economic realities of solid waste transportation and the Fiscal Court's political control over the County.

Section 2 of the Sherman Antitrust Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2. Illegal monopolization consists of "(1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ To meet the first requirement, Blue Ribbon must show that the County had the "power to control prices or exclude competition" in the relevant market. *Id.* at 571, 86 S.Ct. 1698. The relevant market in the context of solid waste disposal is not the area in which people produce solid waste but rather the competitive area for waste disposal services. *See C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390–91, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (concluding that the article of commerce at issue in solid waste disposal cases is not always simply the solid waste itself but is often instead the services utilized to process and dispose of the waste). The area where waste disposal services are "reasonably interchangeable by consumers for the same purposes" is the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). When determining the relevant market for waste disposal services, we look to the choices available to customers of such services and the extent of those choices. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Here then, to determine the relevant market, we must determine in what area in and around Hardin County waste disposal services can reasonably be offered in competition with services provided by Hardin County itself.

The district court rejected Blue Ribbon's argument that the relevant market was only Hardin County and that the Defendants controlled the entire market. The court ruled that the relevant market was

broader and included the counties contiguous to Hardin County, extending at least seventy-five miles in all directions from the site of the landfill in Hardin County. Because Blue Ribbon failed to introduce evidence that the Fiscal Court controlled the siting of landfills outside of Hardin County, Blue Ribbon failed to show that the Fiscal Court monopolized the relevant market.

We agree with the district court. Blue Ribbon has offered no evidence that the relevant market consists only of Hardin County itself. In fact, Blue Ribbon's president stated that the relevant market extended for seventy-five miles around the landfill, and Blue Ribbon's application to the Fiscal Court listed the counties contiguous to Hardin County as the market from which Blue Ribbon's proposed landfill would draw waste. Thus, Blue Ribbon's own factual assertions point to a market broader than just Hardin County. Since residents within and without Hardin County can purchase landfill services from landfills both inside and outside of Hardin County, the relevant market extends beyond the County's borders.

■ Blue Ribbon offers no evidence contradicting the district court's factual findings. Instead, Blue Ribbon relies heavily on an earlier D.C. Circuit case to assert that Hardin County was itself an "essential facility" to which Blue Ribbon needed access to compete. In *Hecht v. Pro–Football, Inc.*, 570 F.2d 982 (D.C.Cir. 1977), the court faced a suit by persons seeking an American Football League franchise and needing access to RFK Stadium in Washington, D.C. The plaintiffs sued the Washington Redskins and the District of Columbia Armory Board (the entity which operated RFK Stadium) claiming that the restrictive covenant in the Redskins' lease of the Stadium violated antitrust laws. *Id.* at 985. The major area of contention between the parties was

the extent of the relevant market. *Id.* at 988. Defining the relevant geographic market as the "area of effective competition," *id.* (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)), the court ruled that the relevant area was Washington, D.C. itself, because that was the area in which consumers of football entertainment could "practicably turn." *Id.* at 989. The court also ruled that the plaintiffs were entitled to an "essential facility" instruction. *Id.* at 992–93. An essential facility is one that without the ability to use the facility competitors are economically unable to compete and the facility is such that it cannot be divided. *Id.*

Blue Ribbon argues that the county is itself an essential facility to which Blue Ribbon must have access to compete in the relevant market. This is a clever but unavailing argument. *Hecht* is distinguishable because in *Hecht*, if the plaintiffs had not been allowed access to RFK Stadium, they would have been excluded from the entire relevant market. Here, by contrast, Blue Ribbon has presented no evidence that its exclusion from Hardin County would entirely exclude it from the relevant market. Blue Ribbon has not shown that it cannot access the market by creating a landfill on any border of the County. Given the at least seventy-five mile radius of profitability for hauling solid waste to a landfill, and the less than seventy-five mile diameter of Hardin County, Blue Ribbon can still access the relevant market and thus the County is not an essential facility.

■ The second prong of a Section 2 claim requires Blue Ribbon to establish that the Fiscal Court and Commission wilfully acquired monopoly power in the relevant market through anticompetitive means. *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir.1991). But Blue Ribbon has of-

fered no evidence that the Fiscal Court has monopoly power at all in the County in light of the Cabinet's ability and authority to override the Fiscal Court's decisions. If Hardin County cannot make anticompetitive decisions itself, but instead must subject those decisions to the will of other independent authorities, Hardin County does not have the power to exclude competition or raise prices and is therefore not a monopolist. Furthermore, Blue Ribbon has failed to introduce evidence that the County acted through anticompetitive means. Rather, the County acted pursuant to state mandates to ensure that it had adequate solid waste capacity.

In sum, we hold Blue Ribbon has failed to carry its burden and show that the County violated Section 2. We therefore affirm the district court's grant of summary judgment to the defendants on this issue.

## CONCLUSION

We are not deaf to Blue Ribbon's implicit cry of unfairness here. Blue Ribbon is not only being denied to opportunity to make the best use of its property—a use for which the property is geologically suited and for which the property was purchased—it is being denied that opportunity by the very body that will itself operate the kind of facility Blue Ribbon intended to operate. Fairness, however, is not the issue before us. And Blue Ribbon has not shown that the County's denial of the necessary permit works a taking under state law or violates either the Commerce Clause or the Sherman Act. Fair or not, the County's actions were not illegal. Accordingly, we AFFIRM the judgment of the district court.