# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 02-2366
_____

| | | |
|---|---|---|
| South Dakota Farm Bureau, Inc.; South Dakota Sheep Growers Association, Inc.; Haverhals Feedlot, Inc.; Sjovall Feedyard, Inc.; Frank D. Brost; Donald Tesch; William A. Aeschlimann; Spear H. Ranch, Inc.; Marston Holben; Marston and Marian Holben Family Trust; Montana-Dakota Utilities Company; Northwestern Public Service; Otter Tail Power Company, | * * * * * * * * * * * | Appeals from the United States District Court for the District of South Dakota. |
| Plaintiffs - Appellees, | * * | |
| v. | * * | |
| Joyce Hazeltine, in her official capacity as Secretary of State of South Dakota; Mark W. Barnett, in his official capacity as Attorney General of South Dakota, | * * * * * * | |
| Defendants - Appellants, | * * | |
| Dakota Rural Action; South Dakota Resources Coalition, | * * * | |
| Intervenors Defendants, | * * | |
| ------------------------ | * * | |

State of Nebraska; Everett Holstein;    *
Rudy Meduna; Dan Hodges,                *
                                        *
    Amicus on Behalf of Appellants,    *
                                        *
The American Farm Bureau Federation;    *
Alabama Farm Bureau Federation;         *
Arkansas Farm Bureau Federation;        *
Kansas Farm Bureau Federation;          *
Kentucky Farm Bureau Federation;        *
Minnesota Farm Bureau Federation;       *
North Dakota Farm Bureau Federation;    *
Utah Farm Bureau Federation,            *
                                        *
    Amicus on Behalf of Appellees.     *

_____

No. 02-2588

_____

South Dakota Farm Bureau, Inc.;         *
South Dakota Sheep Growers              *
Association, Inc.; Haverhals Feedlot,   *
Inc.; Sjovall Feedyard, Inc.; Frank D.  *
Brost; Donald Tesch; William A.         *
Aeschlimann; Spear H. Ranch, Inc.;      *
Marston Holben; Marston and Marian      *
Holben Family Trust; Montana-Dakota     *
Utilities Company; Northwestern         *
Public Service; Otter Tail Power        *
Company,                                *
                                        *
      Plaintiffs - Appellees,         *
                                        *
   v.                                  *
                                        *

-2-

Joyce Hazeltine, in her official capacity   *
as Secretary of State of South Dakota;      *
Mark W. Barnett, in his official            *
capacity as Attorney General of             *
South Dakota,                               *
                                            *
        Defendants,                         *
                                            *
Dakota Rural Action; South Dakota           *
Resources Coalition,                        *
                                            *
    Intervenors Defendants - Appellants,    *
                                            *
----------------------------                *
                                            *
Everett Holstein; Rudy Meduna;              *
Dan Hodges,                                 *
                                            *
        Amicus on Behalf of Appellants.     *

_____

No. 02-2644

_____

South Dakota Farm Bureau, Inc.; South       *
Dakota Sheep Growers Association,           *
Inc.; Haverhals Feedlot, Inc.; Sjovall      *
Feedyard, Inc.; Frank D. Brost; Donald      *
Tesch; William A. Aeschlimann,              *
                                            *
        Plaintiffs,                         *
                                            *
Spear H. Ranch, Inc.; Marston Holben;       *
Marston and Marian Holben Family            *
Trust,                                      *
                                            *

-3-

Plaintiffs - Appellants,                        *
                                                *
Montana-Dakota Utilities Company;               *
Northwestern Public Service; Otter              *
Tail Power Company,                             *
                                                *
        Plaintiffs,                             *
                                                *
        v.                                      *
                                                *
Joyce Hazeltine, in her official                *
capacity as Secretary of State of South         *
Dakota; Mark W. Barnett, in his                 *
official capacity as Attorney General           *
of South Dakota,                                *
                                                *
        Defendants - Appellees,                 *
                                                *
Dakota Rural Action; South Dakota               *
Resources Coalition,                            *
                                                *
    Intervenors Defendants - Appellees.         *

_____

No. 02-2646
_____

South Dakota Farm Bureau, Inc.; South           *
Dakota Sheep Growers Association,               *
Inc.; Haverhals Feedlot, Inc.; Sjovall         *
Feedyard, Inc.; Frank D. Brost; Donald         *
Tesch; William A. Aeschlimann,                 *
                                                *
        Plaintiffs - Appellants,                *
                                                *
Spear H. Ranch, Inc.; Marston Holben;           *

Marston and Marian Holben Family  *
Trust; Montana-Dakota Utilities  *
Company; Northwestern Public  *
Service; Otter Tail Power Company,  *
                                 *
       Plaintiffs,               *
                                 *
       v.                        *
                                 *
Joyce Hazeltine, in her official  *
capacity as Secretary of State of South  *
Dakota; Mark W. Barnett, in his  *
official capacity as Attorney General  *
of South Dakota,                 *
                                 *
       Defendants - Appellees,   *
                                 *
Dakota Rural Action; South Dakota  *
Resources Coalition,             *
                                 *
    Intervenors Defendants - Appellees.  *

_____

Submitted:  February 10, 2003

Filed:  August 19, 2003
_____

Before BOWMAN, FAGG, and MORRIS SHEPPARD ARNOLD,  Circuit Judges.
_____

BOWMAN, Circuit Judge.

The South Dakota Constitution prohibits corporations and syndicates, subject to certain exemptions, from acquiring or obtaining an interest in land used for farming and from otherwise engaging in farming in South Dakota.  This restriction, known as

Amendment E, was added to the South Dakota Constitution as the result of a 1998 referendum. The thirteen Plaintiffs in this case allege that Amendment E violates the dormant Commerce Clause of the United States Constitution, and a smaller group of these Plaintiffs also claims that it violates the Americans with Disabilities Act (ADA).

Prior to trial, the District Court dismissed the ADA claim, and the Plaintiffs amended their complaint to delete that claim. After a bench trial, but prior to issuing its opinion, the District Court sent a memorandum to all parties stating that it erred in dismissing the ADA claim before trial. In its opinion, the District Court concluded that Amendment E violates both the ADA and the dormant Commerce Clause, and it enjoined Defendants Joyce Hazeltine, the South Dakota secretary of state, and Mark Barnett, the State's attorney general, from enforcing Amendment E. S.D. Farm Bureau, Inc. v. Hazeltine, 202 F. Supp. 2d 1020 (D.S.D. 2002). Hazeltine and Barnett appeal, as do two parties that intervened on the side of the Defendants, Dakota Rural Action and South Dakota Resources Council.

We conclude that the District Court improperly considered the ADA claim, but we affirm its judgment by concluding that Amendment E contravenes the dormant Commerce Clause.

I.

Amendment E was codified as four sections of Article XVII of the South Dakota Constitution. Section 21, the prohibitory provision, states that "[n]o corporation or syndicate may acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any real estate used for farming in this state, or engage in farming." S.D. Const. art. XVII, § 21. A corporation or syndicate can avoid the prohibition of § 21 if it fits within one of fifteen exempted categories listed in § 22, five of which are relevant to the issues raised on appeal.

The first of these relevant exemptions is for a "family farm corporation or syndicate," which is defined as

> a corporation or syndicate engaged in farming or the ownership of agricultural land, in which a majority of the partnership interests, shares, stock, or other ownership interests are held by members of a family or a trust created for the benefit of a member of that family. The term, family, means natural persons related to one another within the fourth degree of kinship according to civil law, or their spouses. At least one of the family members in a family farm corporation or syndicate shall reside on or be actively engaged in the day-to-day labor and management of the farm. Day-to-day labor and management shall require both daily or routine substantial physical exertion and administration.

Id. § 22, cl. 1. The ADA claim in this case is based on the inability of physically disabled farmers and ranchers to qualify for this exemption.

The second relevant exemption in § 22 applies to land and livestock in which a cooperative has a legal interest, so long as the cooperative fulfills certain prerequisites related to family ownership.[1] Id. cl. 2. As the District Court noted, this

---

[1]In full, the exemption applies to:

> [a]gricultural land acquired or leased, or livestock kept, fed or owned, by a cooperative organized under the laws of any state, if a majority of the shares or other interests of ownership in the cooperative are held by members in the cooperative who are natural persons actively engaged in the day-to-day labor and management of a farm, or family farm corporations or syndicates, and who either acquire from the cooperative, through purchase or otherwise, such livestock, or crops produced on such land, or deliver to the cooperative, through sale or otherwise, crops to be used in the keeping or feeding of such livestock.

is a curious exemption because § 21, by its own terms, applies only to "corporations and syndicates" and not specifically to cooperatives.

Amendment E also contains an exemption known as a "grandfather clause" that applies to interests in agricultural land owned by corporations and syndicates as of the effective date of Amendment E. Id. cl. 4. Section 22 has a similar provision for livestock that corporations and syndicates owned as of the effective date of Amendment E. Id. cl. 5. The final exemption of note is for corporations or syndicates that acquire or lease agricultural land for immediate or potential non-farming purposes. Id. cl. 10.

## II.

Thirteen parties, to whom we will refer collectively as "the Plaintiffs," challenge the legality of Amendment E. Two of the Plaintiffs are South Dakota corporations: Haverhals Feedlot, Inc. (HFI), and Sjovall Feedyard, Inc. (SFI). Each owns a custom cattle feedlot, which means that they raise cattle owned by third parties. The third parties deliver cattle to the feedlots but retain ownership of the cattle. The feedlots then raise the cattle in preparation for slaughter. HFI and SFI claim that § 21 prohibits corporations who own cattle from contracting with South Dakota feedlots because the corporations would be engaging in farming in South Dakota. In short, these two Plaintiffs claim that Amendment E—if enforced—would put them out of business because they earn their revenue from feeding cattle owned by non-exempt entities.

Plaintiffs Donald Tesch and William Aeschlimann engage in unincorporated livestock feeding businesses in South Dakota. Tesch is in the seventh year of a ten-year contract to raise hogs for Harvest States Cooperative, which is based in

---

S.D. Const. art. XVII, § 22, cl. 2.

-8-

Minnesota. Although the hogs Tesch is raising under this contract are exempted by Amendment E's grandfather clause for livestock, Tesch claims that § 21 bars Harvest States from engaging in farming in South Dakota and, therefore, from entering into a subsequent contract with him. As for Aeschlimann, he feeds lambs owned by third parties, many of whom are non-exempt corporations pursuant to Amendment E. He thus claims that Amendment E will drastically reduce his income because it prohibits the non-exempt entities from contracting with him.

Spear H Ranch (Spear H), another corporate Plaintiff, is an Arizona corporation that does business in South Dakota, operating a cattle ranch. Its sole shareholder is the Marston and Marian Holben Family Trust, which is also a Plaintiff, as is Marston Holben individually. Spear H, the Holben Trust, and Holben claim that Amendment E prohibits Spear H from acquiring additional land in South Dakota and farming it because, aside from the grandfather clause, Spear H does not fit into any of § 22's exemptions. Specifically, the family farm exemption of § 22(1) cannot apply because the Holbens do not reside or work on the ranch.

Plaintiff Frank Brost is the majority or sole stakeholder in three entities, none of which are Plaintiffs, that own ranch land and livestock in South Dakota. The grandfather clause of Amendment E permits these entities to continue using the land they owned as of Amendment E's effective date, but Brost reads § 21 to prohibit them from owning additional land and from engaging in additional farming. Because Brost does not live on the ranch land, nor do any of his family members, he believes that the family farm corporation exemption of § 22(1) would not apply to his three businesses. In addition, Brost individually owns ranch land, and he claims that Amendment E has diminished the value of the land because its most likely purchasers are corporations that cannot acquire the land under Amendment E.

Two interest groups, on behalf of their members, have also joined as Plaintiffs. The first is the South Dakota Farm Bureau (SDFB), which represents the interests of

farm, ranch, and rural families in South Dakota. It claims that Amendment E has damaged its members by prohibiting their limited liability entities from farming in South Dakota and by effectively preventing them from contracting with corporations and syndicates. The South Dakota Sheep Growers' Association similarly claims that many of its members cannot farm in corporate form or contract with certain entities.

The final three Plaintiffs are utility companies that claim Amendment E applies to, and increases the cost of, easements they must acquire for a power plant.

On the other side, two not-for-profit groups—Dakota Rural Action (DRA), which represents the interests of family farmers, and South Dakota Resources Council (SDRC), which advocates protection of the environment—intervened permissively, joining the South Dakota secretary of state and attorney general as Defendants. DRA and SDRC were both heavily involved in drafting Amendment E and promoting it during the campaign leading up to the referendum. We will refer to Hazeltine and Barnett as "the State Officials," to DRA and SDRC as "the Intervenors," and to all four parties collectively as "the Defendants."[2]

### III.

We first consider the ADA claim initially advanced only by SDFB, but later joined by Plaintiffs Brost and Holben. The family farm corporation exemption in § 22(1) requires a family member to reside on a farm or engage in "both daily or routine substantial physical exertion and administration." S.D. Const. art. XVII, § 22, cl. 1. The rationale supporting the ADA claim is that Amendment E discriminates against disabled farmers, such as Brost and Holben, whose corporations cannot

---

[2] The State Officials and the Intervenors filed separate briefs and had separate counsel at trial and on appeal.

qualify for this exemption because their owners are physically unable to participate in the daily labor and management of the land.

Eleven months before trial, the Defendants successfully moved to dismiss the ADA claim on the basis that a plaintiff cannot seek prospective injunctive relief for ADA claims from state officials in their official capacities. Hr'g Tr. at 5–6 (Jan. 18, 2000). The Plaintiffs then amended their complaint to remove the ADA claim. There was no mention of the ADA claim during the pre-trial conference or during the trial, which took place from December 3–7, 2001. On December 12, before the District Court issued its opinion, the District Court sent a memorandum to the parties explaining that, at the time of trial, it "was somewhat behind in [its] reading" of Eighth Circuit case law. Dist. Ct. Mem. to Counsel (Dec. 12, 2001). The District Court wrote that, on November 6, 2001, we concluded in Grey v. Wilburn, 270 F.3d 607, 609 (8th Cir. 2001), that a plaintiff can indeed request prospective injunctive relief for ADA violations from state officials in their official capacities.[3] The District Court wrote in its December 12 memorandum that its decision to dismiss the ADA claim was incorrect pursuant to Grey, and it directed the parties to "keep this in mind as you submit further arguments." Dist. Ct. Mem. to Counsel (Dec. 12, 2001).

On the basis of Grey, the District Court reconsidered the ADA claim and concluded that Amendment E violated the ADA. The Court explained its decision to rule on the ADA claim as proper because Brost and Holben submitted ADA claims as offers of proof at trial: they testified that they are unable to engage in strenuous ranching activities. Trial Tr. at 66, 255. The Defendants argue that the District Court abused its discretion by reinstating the ADA claim, while the Plaintiffs defend the District Court's sua sponte revival of the claim as a proper decision to conform the

---

[3]Grey was not the first case in which we permitted a plaintiff to seek injunctive relief for an ADA violation from a state official in his or her official capacity. See Gibson v. Ark. Dep't of Corr., 265 F.3d 718, 722 (8th Cir. 2001).

pleadings to the evidence at trial. <u>See</u> Fed. R. Civ. P. 15(b). The pleadings may only be amended when issues not in the pleadings are tried by the parties' "express or implied consent." <u>Id.</u> In order to consent to the trial of an unpleaded issue, a party must have notice of that issue and must have been given adequate opportunity to cure any surprise caused by the amendment to the pleadings. <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1063 (8th Cir. 1997). We review a district court's decision to conform the pleadings to the evidence for an abuse of discretion. <u>Clark v. Martinez</u>, 295 F.3d 809, 815 (8th Cir. 2002).

The record contains no evidence that the Defendants expressly consented to the trial of the ADA claim, and we do not believe there is enough evidence to satisfy the demanding standard for implied consent. <u>See</u> <u>Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc.</u>, 117 F.3d 180, 193 (5th Cir. 1997) (stating that "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b)" (citation to quoted case omitted)). The offers of proof concerning the respective states of health of Brost and Holben cannot be considered notice to the Defendants that the ADA claim was being tried; the purpose of the offers of proof was never stated, and there is simply no basis for us to conclude that the Defendants impliedly consented to the trial of the ADA claim. It is significant to us that the District Court had dismissed the ADA claim and that the Plaintiffs deleted the ADA claim from their complaint; if the Defendants had any notice of the ADA claim, their notice was that the District Court would not permit the claim to be heard and that the Plaintiffs had no intent to try it. Moreover, the ADA was never discussed during trial. Without notice, the Defendants lacked an adequate opportunity to cure the surprise caused by the District Court's constructive amendment to the pleadings: they could not present evidence or cross-examine witnesses concerning any issue, factual or legal, related to the claim.

The Plaintiffs argue that the Defendants had an opportunity to cure the surprise because the District Court instructed the parties to address a potential ADA claim in their post-trial briefs. The purpose of Rule 15(b), however, is to ensure that the

pleadings do not obstruct a court's ability to address the issues that were presented and defended at trial. In this case, the ADA claim was never presented or defended at trial, so it is immaterial that the Defendants could defend the ADA claim in their post-trial briefs. We conclude that the District Court abused its discretion in constructively amending the pleadings to include the ADA claim. The judgment cannot stand insofar as it is based on that claim.[4]

## IV.

Before we turn to the dormant Commerce Clause claim, we must first address the State Officials' argument that the Plaintiffs lack standing to raise this claim. We "are under an independent obligation to examine [our] own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)) (first alteration by this Court). If a plaintiff lacks standing, a court is without subject matter jurisdiction. Faibisch v. Univ. of Minn., 304 F.3d 797, 801 (8th Cir. 2002). Whether a court has subject matter jurisdiction is an issue that any party or the court may raise at any time. Fromm v. Comm'n of Veterans Affairs, 220 F.3d 887, 890 (8th Cir. 2000).

To establish standing, a plaintiff must show three things. "First, the plaintiff must have suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks and

---

[4]The District Court also justified its reconsideration of the ADA claim on the ground that SDFB had associational standing to bring the ADA claim. S.D. Farm Bureau, Inc. v. Hazeltine, 202 F. Supp. 2d 1020, 1039 (D.S.D. 2002). The issue of SDFB's standing, however, is irrelevant to Rule 15(b) analysis. The question is not whether one of the Plaintiffs was constitutionally and prudentially entitled to raise the ADA claim at trial, but rather whether the claim was in fact raised and actually tried.

citations to quoted cases omitted). Second, the injury must be traceable to the defendant's challenged action. Id. Third, it must be "likely" rather than "speculative" that a favorable decision will redress the injury. Id. at 561. The standing challenge in this case concerns the first element: whether any of the Plaintiffs have suffered an injury in fact.

The Defendants insist that HFI, SFI, Tesch, and Aeschlimann lack standing because the prohibitions of § 21 apply only to their contracting partners. A third party does not have standing to assert "the rights or legal interests of others in order to obtain relief from injury to themselves." Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1379 (8th Cir.) (quoting Warth v. Seldin, 422 U.S. 490, 509 (1975)), cert. denied, 522 U.S. 1029, 1036 (1997). But "[i]n Commerce Clause jurisprudence, cognizable injury is not restricted to those members of the affected class against whom states or their political subdivisions ultimately discriminate." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 183 (1st Cir. 1999). For example, in General Motors Corp. v. Tracy, 519 U.S. 278 (1997), an Ohio statute charged out-of-state natural gas vendors at a higher sales tax rate than certain in-state vendors. Although General Motors was not an out-of-state natural gas vendor, it had standing to challenge the statute's constitutionality because it was financially injured; its Ohio manufacturing facility purchased virtually all of its natural gas from out-of-state suppliers, which had passed on the cost of the higher Ohio tax rate to its customers. Id. at 286. HFI, SFI, Tesch, and Aeschlimann are similarly situated: they do substantial business with out-of-state corporations affected by the challenged law. Their imminent loss of that business as a result of Amendment E's enforcement satisfies the injury-in-fact requirement of standing. See Clinton v. City of New York, 524 U.S. 417, 431 (1998) (concluding party had shown sufficient injury because defendant's action had a negative effect on party's "borrowing power, financial strength, and fiscal planning"); Lujan, 504 U.S. at 560 (stating that injury may be actual or imminent to satisfy standing); Ben Oehrleins, 115 F.3d at 1379 (finding sufficient injury-in-fact in suit against county where county

-14-

ordinance prohibited plaintiffs from gaining access to market); <u>Lepelletier v. FDIC</u>, 164 F.3d 37, 42 (D.C. Cir. 1999) (noting court had previously held that denial of business opportunity can satisfy injury requirement).[5]

Because we conclude that HFI, SFI, Tesch, and Aeschlimann have standing, we need not verify the independent standing of the other Plaintiffs, for they all raise similar arguments for affirmance. <u>See</u> <u>Clinton</u>, 524 U.S. at 432 n.19; <u>Houlton</u>, 175 F.3d at 183.

V.

The District Court held that Amendment E violates the dormant Commerce Clause. We review this conclusion of law de novo. <u>See</u> <u>R & M Oil & Supply, Inc. v. Saunders</u>, 307 F.3d 731, 734 (8th Cir. 2002).

A.

The Plaintiffs contend that Amendment E violates the so-called dormant Commerce Clause of the United States Constitution. The Commerce Clause, of course, grants Congress the authority to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. The dormant Commerce Clause is the negative implication of the

---

[5]We note that the Defendants also argued that Tesch cannot show an injury because they do not read Amendment E to bar Harvest States from engaging in farming in South Dakota. Were we to apply the canon of *expresio unius est exclusio alterius*, we could interpret § 21 not to apply to cooperatives because § 21 does not list cooperatives. Section 22(2), however, exempts certain types of cooperatives from the restrictions of § 21. This exemption would be meaningless unless cooperatives were subject to § 21. Therefore, in order to avoid construing § 22(2) as being mere surplusage, we interpret § 21 to restrict cooperatives in the same way that it does corporations and syndicates. <u>See</u> <u>United States v. Gomez-Hernandez</u>, 300 F.3d 974, 979 (8th Cir. 2002), <u>cert. denied</u>, 123 S. Ct 929, 931 (2003).

Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce. Quill Corp. v. North Dakota, 504 U.S. 298, 312 (1992). The recognition of the dormant Commerce Clause carries out "the Framers' purpose to 'preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'" Fulton Corp. v. Faulkner, 516 U.S. 325, 330–31 (1996) (quoting Okla. Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 180 (1995)) (alteration in Fulton Corp.). The vision of the Framers was that "every farmer . . . shall be encouraged to produce by the certainty that he will have free access to every market in the Nation." H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 539 (1949).

A state law that is challenged on dormant Commerce Clause grounds is subject to a two-tiered analysis. First, the court considers whether the challenged law discriminates against interstate commerce. Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994). Discrimination in this context refers to "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. If Amendment E is indeed discriminatory, it is "*per se* invalid" unless the Defendants "can demonstrate, under rigorous scrutiny, that [they] have] no other means to advance a legitimate local interest." C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 392 (1994). If the law is not discriminatory, the second analytical tier provides that the law will be struck down only if the burden it imposes on interstate commerce "is clearly excessive in relation to its putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). The Plaintiffs argue that Amendment E cannot survive scrutiny under either test; that is, they argue that Amendment E impermissibly discriminates against interstate commerce and also fails the Pike balancing test.

In the first tier of analysis, the Supreme Court has recognized three indicators of discrimination against out-of-state interests. First, discrimination can be discerned

where the evidence in the record demonstrates that the law has a discriminatory purpose. Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270 (1984). Alternatively, a law could facially discriminate against out-of-state interests. See, e.g., Chem. Waste Mgmt. v. Hunt, 504 U.S. 334, 342 (1992). Third, even if a state law responds to legitimate local concerns and is not discriminatory either in its purpose or on its face, the law could discriminate arbitrarily against interstate commerce, that is, it could have a discriminatory effect. Maine v. Taylor, 477 U.S. 131, 148 n.19 (1986). The Plaintiffs assert that Amendment E satisfies all three discrimination tests, but we rest our conclusion on the evidence in the record of a discriminatory purpose underlying Amendment E. As a result, we do not consider the other two tests, or the second tier analysis, the Pike balancing test.

The Plaintiffs have the burden of proving discriminatory purpose, see Hughes v. Oklahoma, 441 U.S. 322, 336 (1979), and can look to several sources to meet that burden. The most obvious would be direct evidence that the drafters of Amendment E or the South Dakota populace that voted for Amendment E intended to discriminate against out-of-state businesses. See SDDS, Inc. v. South Dakota, 47 F.3d 263, 268 (8th Cir. 1995). The record contains a substantial amount of such evidence as regards the drafters, the most compelling of which is the "pro" statement on a "pro-con" statement compiled by Secretary of State Hazeltine and disseminated to South Dakota voters prior to the referendum. See Constitutional Amendment E: Attorney General Explanation. Submitted by Charlie Johnson and Dennis Wiese—co-chairmen of the organization responsible for Amendment E's promotion (Wiese was a drafter of Amendment E)—the "pro" statement informed voters that, without the passage of Amendment E, "[d]esperately needed profits will be skimmed out of local economies and into the pockets of distant corporations." Id. Further language from the "pro" statement explains that "Amendment E gives South Dakota the opportunity to decide whether control of our state's agriculture should remain in the hands of family farmers and ranchers or fall into the grasp of a few, large

corporations." Id. We interpret the "pro" statement to be "brimming with protectionist rhetoric." See SDDS, 47 F.3d at 268.

Notes from the Amendment E drafting meetings provide additional direct evidence of the drafters' intent to discriminate against out-of-state businesses. Nancy Thompson, who was involved in the drafting, testified that Murphy Family Farms and Tyson Foods, two out-of-state corporations, were proposing to build hog farming facilities in South Dakota and that Amendment E's supporters wanted "to get a law in place to stop them." Trial Tr. at 244. At a meeting on March 14, 1997, discussions were held concerning the best way to combat Tyson, Murphy, and others. Draft Hog Meeting Minutes (Mar. 14, 1997). A memorandum from April 28, 1997, from John Bixler, director of DRA, to participants from an April 21 meeting stated, in reference to a discussion at the April 21 meeting, that "[m]any have commented that just as they do not want Murphys and Tysons walking all over them, they don't want Farmland or Minnesota Corn Producers walking over them . . . either." Memorandum from John Z. Bixler at 4 (Apr. 28, 1997). These comments concern the drafters' desire to prohibit out-of-state cooperatives, in addition to corporations, from farming in South Dakota. We also note that the planning meetings that led to Amendment E were known as the "hog meetings." Trial Tr. at 370; see also Draft Hog Meeting Minutes (Mar. 14, 1997). Again, this is a specific reference to the out-of-state corporations who enter into contracts with South Dakota farmers to raise hogs. Even more blatant was the remark at trial by Wiese that Amendment E was at least motivated in part by "the Murphy hog farm unit [in North Carolina] and what its [sic] done to the environment." Trial Tr. at 659.

As for indirect evidence of discriminatory purpose, irregularities in the drafting process can hint at such a purpose. See SDDS, 47 F.3d at 269. Our concern in this case about the drafting process is the information used by the drafters. In this case, the record leaves a strong impression that the drafters and supporters of Amendment E had no evidence that a ban on corporate farming would effectively

-18-

preserve family farms or protect the environment, and there is scant evidence in the record to suggest that the drafters made an effort to find such information.

The testimony of Mary Luanne Napton, executive director of SDRC and secretary of the Amendment E drafting committee, illuminates this point. Napton, a "registered environmental professional," Trial Tr. at 348, testified that she was unfamiliar with all of South Dakota's environmental regulations at the time Amendment E was drafted. Id. at 386. She nevertheless believed that Amendment E would be necessary even if the State's current environmental regulations were enforced. Id. at 387. Her rationale was that "personal responsibility" was the best way to ensure regulatory compliance, suggesting that family-owned farms would accept responsibility where corporate-owed farms would not. Id. We recognize the argument that an individual farmer could have greater incentive than a limited liability entity to avoid wrongdoing, but we believe that if the drafters were seriously concerned with long-term environmental hazards, as Napton claimed she was, they would have made it a point to learn of the effects of current regulations. It is especially disconcerting that Napton—who has also spent ten years lobbying the legislature for new environmental regulations—could not explain the present and future effects of the current environmental laws. If she lacked this information, we can presume that the entire committee did, too.[6]

The record contains even less evidence that the drafters considered how Amendment E would affect the economic viability of family farmers. The drafters

---

[6]The Defendants do not, of course, bear the burden of disproving a discriminatory purpose, but they almost certainly would have introduced any evidence used by the drafting committee that compared the potential impact that Amendment E would have on the environment with enhanced enforcement of current environmental regulations; such evidence is highly relevant to the "per se" invalidity test of the first tier of dormant Commerce Clause analysis as well as to measuring Amendment E's benefit for the purposes of the Pike balancing test of the second tier.

relied on studies that correlated industrialized farming with higher levels of poverty. There is no evidence in the record, however, that they utilized or commissioned any economic forecasts as to the effect of wholly shutting out corporate entities from farming in South Dakota. Even when an expert contacted by a member of the drafting committee inquired whether it was a good idea to create such "complete" barriers to capital flow into the state, Comments on YSD Proposed Constitutional Amendment ¶ 7, the committee charged forward without hesitation, see Trial Tr. at 420. Our point here is not to adopt one economic theory or another, but rather to emphasize that no study or forecast was commissioned to evaluate any theories. We believe that this lack of information serves as indirect evidence of the drafters' intent to create a law specifically targeting out-of-state businesses, which the drafters viewed as the sole cause of the perils facing family farmers and a leading potential cause of environmental damage. Another source of evidence from the drafting process supports this inference: a member of the drafting committee admitted that the committee completed the drafting process quickly because its members wanted to prevent Tyson Foods and Murphy Family Farms from building facilities in South Dakota. Trial Tr. at 244–45.

Whether Amendment E would protect family farmers and the environment is unknown. It would be reasonable to surmise that the less information concerning the potential impact of Amendment E that the drafters had, the less likely that Amendment E would actually be an effective remedy for the problems it was purportedly designed to address. A low probability of effectiveness can be indirect evidence of discriminatory purpose. SDDS, 47 F.3d at 268–69; see also Pete's Brewing Co. v. Whitehead, 19 F. Supp. 2d 1004, 1016 (W.D. Mo. 1998) (resting discriminatory intent conclusion partially on determination that statute at issue did little to advance its purported purpose). But more importantly, we believe, the evidence in the record demonstrates that the drafters made little effort to measure the probable effects of Amendment E and of less drastic alternatives. We are thus left, like the South Dakota populace that voted on Amendment E, without any evidence

as to the law's potential effectiveness. That the drafting committee and the voters were without such evidence supports the conclusion compelled by the direct evidence: the intent behind Amendment E was to restrict in-state farming by out-of-state corporations and syndicates in order to protect perceived local interests. Such an intent bespeaks of "the economic protectionism that the Commerce Clause prohibits." See W. Lynn Creamery v. Healy, 512 U.S. 186, 205 (1994).

In concluding that Amendment E was motivated by a discriminatory purpose, we are cognizant of the argument that discerning the purpose of a constitutional provision is an impossible exercise. In the view of the District Court, "It would be impossible . . . to ascertain the intentions of the thousands of citizens of South Dakota who voted for Amendment E. We do not have here a factual scenario of elected delegates to a constitutional convention where a record is kept of all proceedings." S.D. Farm Bureau, 202 F. Supp. 2d at 1028. We do, however, have evidence of the intent of individuals who drafted the amendment that went before the voters. It is clear that those individuals had a discriminatory purpose. See SDDS, 47 F.3d at 267. Discriminatory purpose is at the heart of dormant Commerce Clause analysis and is often incorporated into both first-tier analysis and second-tier Pike balancing analysis. See, e.g., Fulton Corp., 516 U.S. at 330 (explaining dormant Commerce Clause as a prohibition on state regulations designed with the purpose of benefitting in-state interests by burdening out-of-state interests); W. Lynn Creamery, 512 U.S. at 196 (noting purpose of state's unconstitutional pricing scheme although resting decision on statute's discriminatory effect); Taylor, 477 U.S. at 148 (equating purposeful economic protectionism with per se invalidity).[7] Although the Supreme Court has not

---

[7]See also Donald H. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L Rev. 1091, 1206–1233 (1986) (presenting and defending thesis that Supreme Court's dormant Commerce Clause analysis is driven by desire to prevent purposeful protectionism).

laid out a specific test for determining discriminatory purpose,[8] we are guided by precedent in selecting the types of evidence on which we have relied to reach our conclusion. See Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 336 (4th Cir. 2001) (analyzing "historical background of and specific sequence of events leading up to" challenged state action to find discriminatory purpose), cert. denied, 535 U.S. 904 (2002); SDDS, 47 F.3d at 268 (relying in part on referendum pamphlet to find discriminatory purpose); cf. Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 743–46 (1989) (analyzing statements by drafters of statute in determining proper reading—i.e., purpose—of copyright statute). The evidence in this case leads to a single conclusion: Amendment E was motivated by a discriminatory purpose.

B.

Because we conclude that Amendment E was motivated by a discriminatory purpose, we must strike it down as unconstitutional unless the Defendants can demonstrate that they have no other method by which to advance their legitimate local interests. See C & A Carbone, 511 U.S. at 392. The Supreme Court has referred to this test as one of the "strictest scrutiny." Or. Waste Sys., 511 U.S. at 101. The Defendants emphasize the legitimacy of their interests, which we can generally state to be the promotion of family farms and the protection of the environment. We have previously concluded that promoting family farms is a legitimate state interest, see MSM Farms, Inc. v. Spire, 927 F.2d 330, 333 (8th Cir.) (finding purpose legitimate in Equal Protection Clause analysis), cert. denied, 502 U.S. 814 (1991), and the purpose of environmental protection is equally legitimate. The focus of this test of the "strictest scrutiny," however, does not concern the strength of the interests advanced by the challenged law. Rather, the question is whether reasonable non-

---

[8]See, e.g., Julian Cyril Zebot, Note, Awakening a Sleeping Dog: An Examination of the Confusion in Ascertaining Purposeful Discrimination Against Interstate Commerce, 86 Minn. L. Rev. 1063, 1077–84 (2002) (cataloging and critiquing non-uniform discriminatory purpose analyses by federal courts of appeal).

discriminatory alternatives exist to advance the interests. The Defendants bear the burden of demonstrating there is no such alternative. Or. Waste Sys., 511 U.S. at 100–01.

We cannot say with certainty that any alternative will ultimately succeed in meeting the goals of Amendment E because we are "institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them." See Tracy, 519 U.S. at 308. Our inability to make these determinations explains why the Defendants, who should have the capability to provide economic and environmental forecasts, have the burden of proving that no non-discriminatory alternative exists. Although the record contains evidence linking industrial farming with poverty and environmental problems, it contains no evidence that suggests, evaluates, or critiques alternative solutions.

While we are loath to propose alternatives, we believe several could be found in a 1998 report introduced by the Defendants called "A Time to Act," a report commissioned by the federal government and addressed to the United States Department of Agriculture that lays out the case for regulations that favor family farms. See A Time to Act: A Report of the USDA National Comm'n on Small Farms (1998). Although the recommendations in the Report relate to federal policy and legislation, in many cases those recommendations are applicable to the states, as well. For example, the State could implement an initiative to optimize the labor and resources of small farm operators. See id. at 10. Second, the State could create an oversight process to regulate contracts between corporations and syndicates and South Dakota farmers. See id. at 62–63. In addition, to the extent environmental waste from hog farms is a concern, the State could introduce stricter environmental regulations or could more aggressively enforce its current environmental laws. See Trial Tr. at 659–60. Finally, in an effort to decrease the concentration of livestock in feed lots and the like, the State could set limits on the number of livestock that could

be fed in a particular area by a farmer regardless of how the farmer organizes his or her business.

Regardless of the potential effects of any of these alternatives, the Defendants have failed to meet the high burden of demonstrating their ineffectiveness. Because Amendment E has a discriminatory purpose, and because the Defendants have not satisfied their burden of showing that non-discriminatory alternatives would not advance Amendment E's interests, we must conclude that Amendment E violates the dormant Commerce Clause.[9]

## VI.

Amendment E violates the dormant Commerce Clause. Accordingly, we affirm the order of the District Court enjoining its enforcement.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[9]As we decide this case based upon the first tier of dormant Commerce Clause analysis, we need not discuss the Pike balancing test.